Filed 11/29/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Colusa)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>PAUL ROGER MOORE,<br><br>        Defendant and Appellant. | 3 Crim. C075231<br><br>(Super. Ct. No. CR53504) |

        APPEAL from a judgment of the Superior Court of Colusa County, Jeffrey A. Thompson, J.  Affirmed.

        Diane Nichols, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

        A jury convicted defendant Paul Roger Moore of first degree murder based exclusively on circumstantial evidence that he built and planted a victim-activated bomb in an irrigation pump he knew the farm foreman and eventual victim, Roberto Ayala,

1

would activate.  Paul insists it was his first cousin Peter who had the motive and violent disposition to murder Roberto, a man who had claimed his father's and uncle's affection and devotion.  Paul's narrative of family intrigue has all the earmarks of a Shakespearean tragedy and makes for compelling drama.  Nevertheless, on the narrow legal questions presented, we find substantial evidence to support the verdict and no abuse of discretion in admitting evidence or denying the defense request for surrebuttal closing argument, and therefore affirm the judgment.

## ROBERTO'S DEATH AND THE MOORE FAMILY TRAGEDY

On July 16, 2011, Roberto picked up his seven-year-old son, bought him lunch, and drove to one of the Moore brothers' rice fields to adjust the irrigation pump.  His son heard a loud explosion and saw his father on fire.  He ran to help him, but his father was unresponsive.  He could not retrieve his father's cell phone because his father was on fire.  He ran for about two miles to get help.

Roberto Ayala died instantly from an explosive device that he unknowingly detonated at chest level.  His body was still burning when the firefighters arrived.  There were pieces of metal shrapnel in his chest, neck, and brain.  The perforating shrapnel- or fragment-related injuries occurred immediately before the fire-related injuries.  The forensic pathologist who performed the autopsy opined that the cause of death was explosive shrapnel injuries and high-voltage electrocution.

But the fire and law enforcement officials who performed the initial investigation did not know a bomb had been planted in the irrigation pump.  Their investigation focused on whether the explosion was an accident.  The first responders believed Roberto's truck had been moved because the broken glass was located about 11 feet away and a piece of glass was in the rear tire tread.

Roberto's death occurred against the backdrop of great family disharmony and dissension between the two principals in this deadly drama, Peter and Paul, cousins

2

whose fathers were the sons of Richard and "Mimi" Moore, owners of an 1,800-acre farm near Colusa.

Neither cousin was happy with his place within the family hierarchy. Peter insists that on his deathbed his grandfather expressed his desire for Peter to farm the walnut orchards. But abused and ostracized by his father Gus, whom family members called "Grumpy," Peter was not allowed to farm and instead spent 21 years earning a living in a landscape business he apparently loathed at times. He had been angry and upset with the Moore family since he was 12 years old. Peter tried to convince his grandmother Mimi to disinherit his father, confident that his Uncle Roger would be more fair. On several occasions, he physically threatened to harm, among others, his father, his uncle, and Roberto Ayala. Indeed, shortly before the explosion, Roberto had injured his shoulder and Peter declared that "[w]hen his wing is better, he's all mine." He was upset that Roberto spent Father's Day with Gus and that they were together all the time.

Paul is Roger's son. Paul appears to have suffered more quietly than his cousin. But in a document entitled "My Life" that he stored on his computer, Paul complained bitterly about his life growing up on the farm. He felt mistreated by everyone, including Peter. During tomato harvest, he wrote, he drove the "shitty" tractor, but "pussy" Peter was allowed to drive the tractor with an air-conditioned cab because otherwise Peter was a "prick to work with." Employees, including Roberto Ayala and Roberto's brother Eduardo, were given liberties he was not, such as drinking on the job, taking farm vehicles and equipment for personal use, and getting paid during the winter. Meanwhile, he was treated worse than any employee, worked harder, but was never given a raise. He wrote that his father thought he was stupid, but continually raved about Roberto's intelligence. In describing his life, he pondered what he had done to be treated so poorly by his own family.

While Peter and Paul have very different dispositions, they share similar grievances and similar life trajectories. Clearly, they both had hoped to assume

3

managerial positions on the farm. Their hopes had not materialized. They attempted other ventures that failed—Paul in construction, Peter in starting a sod business. Both suffered physically. Paul injured his back and had to give up construction. Peter had his stomach removed and lost almost 50 pounds.

Most significantly, they shared their animosity toward Roberto Ayala. Roberto had worked for the Moore brothers for 19 years. He was the farm foreman. He was responsible for regulating the water levels on the rice fields. Clearly, over the years he earned the trust and respect of Roger and Gus. There were disagreements where Roger took Roberto's advice over that of his son or nephew. For example, Roberto traveled with Peter to a seminar about operating a sod business, but when Peter expressed interest in purchasing a harvester, Roberto alerted Roger, and Roger disapproved of the purchase. Similarly, when Roberto and Paul disagreed about a design for a mud chisel, Roberto's idea garnered Roger's blessing. Paul complained that Roberto was accorded special privileges, such as keeping sheep and goats by the farm workshop, drinking beer while working or after work, and driving company vehicles home. According to Peter, the Ayala brothers agitated Paul and he remarked, "Those son-of-a-bitches, they are trying to take over my life. I'm going to get that F'er." Peter testified that Paul was severely depressed and he was afraid he was suicidal.

These facts, in large part, form the basis for Paul's arguments at trial and on appeal.

## DISCUSSION

### I

### Peter or Paul: Substantial Evidence to Support the Verdict

There was no direct evidence of who designed, constructed, or placed the explosive device. There were no eyewitnesses, no confessions, no admissions, and no fingerprints or DNA evidence found on any of the parts of the explosive device found at the scene of the murder. Defendant insists there is no substantial evidence that he

4

murdered Roberto Ayala, and the weak circumstantial evidence of his guilt is insufficient to sustain the verdict in the context of the more compelling evidence that his cousin Peter was the perpetrator.

Defendant does not quarrel with the limited scope of appellate review of an insufficiency claim. He acknowledges, as he must, that our task is to review the whole record in the light most favorable to the jury verdict to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Davis* (2009) 46 Cal.4th 539, 606.) We are not at liberty to reweigh evidence or revisit credibility issues. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) If the verdict is supported by substantial evidence, we must defer to the trier of fact; yet a verdict cannot be sustained based on " 'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21.)

In sum, there is an abundance of circumstantial evidence that either Peter or Paul, or perhaps Peter and Paul together, built and planted the bomb that killed Roberto Ayala. We will review that evidence in two steps: first, we will outline the evidence of solid, credible value the jury could have reasonably relied upon in finding Paul guilty of murder beyond a reasonable doubt. And second, we will test the substantiality of that evidence in light of the entire record, that is to say, in light of the compelling circumstantial evidence that Peter, not Paul, blew up Roberto Ayala.

## A.    Circumstantial Evidence Against Paul

### 1.    Opportunity and Familiarity

Paul returned to work on the farm a few years before the explosion. He took on additional responsibilities as his back healed, and by July 2011 Roger had decided to bring on Paul as a 50 percent partner of his half of the farm operation.

5

During his apprenticeship, Paul worked alongside Roberto. In fact, after Roberto injured his shoulder, Paul accompanied him on occasion to the irrigation pumps to adjust water levels. In early July, Paul was asked to drive out to the rice field to turn on the water pump without Roberto. From this evidence, the jury could reasonably infer that because Paul was familiar with Roberto's routine, he could specifically target Roberto by placing the bomb in an electrical pump panel he knew Roberto would be operating. He was familiar, therefore, not only with Roberto's working routine, but also with the operation of the pump.

### 2. Unique Skill Set

Paul told investigators that his electrical experience was limited to fixing an electrical outlet and that he had no experience working on the pump control panels. According to the testimony offered by his father, his son, and his ex-father-in-law, that was a lie.

Paul's son Gunner testified that when Paul was young, he rewired the light switch in his bedroom so he could turn off the light from his bed, but if a person did not flip the switch in a particular way, he or she would be shocked. Later, as a father, Paul taught Gunner how to hard-wire electronics to his car battery so he would not have to use the cigarette lighter to power the electronics in his car. Gunner believed his dad could repair just about anything and could "make something out of nothing." One of Paul's favorite hobbies, according to Gunner, was assembling and flying radio-controlled airplanes.

Gunner also reported that, according to his dad soon after the explosion, his grandfather "feared that there was a booby trap in the switch" and stated that "someone must have been a genius to be able to do that, some type of electrical genius."

Roger attested to his son's aptitude for building things, albeit the examples he cited were not electric. He testified Paul constructed a rice roller and a fertilizer aqua bar in the farm workshop.

6

Over defense objection, Paul's ex-father-in-law testified that Paul apologized to him for tapping his daughter's telephone when they were going through a divorce, putting some kind of recorder under her modular home so he could monitor conversations. The wiretapping occurred in 1995 or 1996. He also testified that Paul and a friend created an acetylene bomb by combining acetylene gas and oxygen in a balloon. The bomb exploded, injuring Paul and his friend. That explosion occurred in about 1991.

From this evidence, the jury could reasonably infer that Paul had both the aptitude and unique skill set needed to build the type of explosive device that killed Roberto Ayala. To be sure, Paul had demonstrated an advanced mechanical aptitude and an understanding of electrical currents.

### 3. Evidence From the Investigation

*July 18*: Two days after Roberto Ayala's death, Paul delivered to investigators a piece of metal he found in a canal near the explosion. He pointed out that the markings or threading on the metal indicated to him the explosion was not an accident. According to Paul, something had been placed at the pump to cause the explosion. He told investigators he had operated the panel five days before the explosion, and he drew an accurate picture of the panel.

On that same day, Paul cast aspersions on Peter. The jurors could have found his behavior odd, even calculated to focus the investigators' attention on his cousin. He showed them copies of text messages he had received from Peter in which Peter expressed his displeasure with the condition of the fields and suggested the field manager (Roberto Ayala) should be fired. The investigators would later discover that Paul had deleted individual text messages he had sent to and received from Peter. Paul told the investigators that Peter had been around the explosion site one day before the explosion.

*August*: On August 11 the investigators were informed that the chemical testing of the fragments from the explosion indicated the presence of nitroglycerine, a chemical used in explosives. This information was not disclosed to the public.

7

The next day, the investigators at the Colusa County Sheriff's Department received a letter with a postmark from Sacramento that they learned was processed by the postal service in West Sacramento. The delivery and return addresses were printed label strips made with a label maker. Eight stamps were attached for postage. The text of the letter was a photocopy of the original; it too contained printed label strips made with a label maker. The letter read:

"I am responsible for the panel explosion. I am military trained. Expert in Vietnam devices. I received info and instructions via USPS. Name, age, vehicle I.D. and plate number. Location and meter number for panel. First three fuses, the device had dual triggers and detonators. Trig one, vibration activated. Trig two, drop weight activated upon door opening. Two-inch gallon pipe and quart of gasoline in plastic bottle. Upon detonation gas atomized for millisecond, completed the circuit triggering flashover, thus electrocution, fail safe and no disarming. Lab results will be military-grade powder, black spray-painted epoxy, no DNA. This was an MS-13 [Mara Salvatrucha, a violent gang] job, something about a Mexico deal gone wrong.

"Why am I helping u? I received another package via USPS, target two, I will not take this job because the info I received is wrong. I got name, age, vehicle description, plate number and location. The target is brother of target one and drives Chevy. This vehicle info is the same as the first job. White Ford, same plate number. I finally found the Ford, and now it is driven by some young guy, not the brother. Since I will not take this job, it will soon be reassigned. Someone will take it. The next guy might not catch the error in info and the wrong person will die.

"I would decline anyway because I saw target two with his girls and that I can't deal with. Target two knows the Mexico connection and that is the reason 4 relocating n will not help target two. They will find him. He needs to be careful. They gave me two months 4 this job. It will be reassigned in five weeks. Whoever is driving the Ford is very much in danger. This was my first and final job. I am sure MS-13 will figure out I

tipped authorities and will soon come for me. My house and property are protected, larger devices. I am over this life. God [*sic*] luck. If u come 4 me, call first. I will come peacefully or detonate all the devices."

Paul, not Peter, used abbreviations such as "u" and "4" in his text messages. The investigators did not believe that a Mexican gang was involved in the explosion because gangs typically advertise their involvement rather than hide it, to incite fear and command respect.

On August 15 the investigators received a second letter and a diagram of a bomb. Like the first letter, the text of the second was made with a label maker and photocopied. This envelope had a postmark from Colusa. The letter stated:

"Ayala was actually warned what would happen if he screwed with these people. He has endangered others in his family. They now want the white Ford F-250 hit. He thought he was safe in the States. Previously driven by target one. They want the brother, but it is now driven by some young guy, or do they want the young guy? This is why I refused this job, but the next guy might kill both to ensure payment. Whoever is driving that white F-250 is in great danger. Another expert will do this job. The money is good. After a career of killing, I want to save a life before I take my life. If u have any questions, place ad in Sac Bee, help wanted, make it the last ad [in the] August 21st issue. This is the second warning letter I have sent u. I wanted to make sure u get [*sic*]. Believe me and have time to do something to help these guys."

One of the investigators described the diagram of the bomb as follows:

"It's a diagram that has writing around the diagram and on the diagram. The writing is comprised in a similar fashion as the letters themselves. The actual printing on the diagram looks like somebody printed it on a label maker, affixed it to the paper and then ran it through a photocopier. There is also freehand drawing on the diagram, and there's also straightedge drawing on the diagram.

"The freehand drawing has some arrows on it. The straightedge drawing is -- the diagram depicts -- what we're led to believe is that the diagram depicts the electrical box. The outside square of the diagram is the electrical box that we've described."

No fingerprints were found on the two letters, and one of the envelopes contained the fingerprints of an unknown person. Neither Peter's nor Paul's DNA matched swabs taken from the letters, envelopes, and stamps.

On August 17 Paul went to the police station voluntarily. He denied involvement in the explosion, declaring it was "a chicken shit way for somebody to do it." As mentioned earlier, he claimed he had little experience with electrical devices and no experience with the irrigation pumps. He denied saying he would fire the Ayala brothers if he ever took over the farm and insisted he liked Roberto. He claimed Roberto was a good person but admitted he became upset when he saw Roberto drinking and driving on the farm.

On August 18 Paul brought in another fragment he thought was suspicious and indicative of a bomb going off. He thereafter refused to come back for any additional interviews.

On August 22 the investigators searched the farm shop with Roger's permission. They found threaded pipe nipple, end caps in the form of reducers and plugs, other end caps, washers, nuts, multicolored wire, and seven-inch bolts. The bolts were just like the bolt discovered at the scene of the explosion. The washers were consistent with washers used on the spikes that had been laid on the road leading away from the explosion site.

*September-October*: On several occasions the FBI dive team searched the canal and the irrigation ditch perpendicular to the canal and found a fuse, hinge, washers and nuts, the inside part of the electrical control panel, part of the post the panel had been mounted on, and a timer box cover. On October 3 investigators also found spikes down a private farm road. Eduardo Ayala told an investigator he saw Paul manufacturing spikes in the farm maintenance shop.

*November*:  By November the investigation had targeted Paul.  The investigators placed a GPS (global positioning system) device on his truck, devices that often malfunction.  On November 24 they noticed the device was not working and they went to Paul's house to investigate.  The investigators did not desire to have personal contact with Paul at the time, so when he saw them driving by his house, the investigators drove away from the area.  As they were driving, they noticed Paul's truck behind them.  Paul then drove to the farm shop.  The investigators drove around the block a couple of times and on one occasion had eye contact with Paul.  They observed his vehicle leave the shop and the driver accelerated and eventually passed them at over 90 miles per hour.  The prosecution argued that Paul was attempting to taunt the police.

*December*:  On December 6 Paul's house was searched.  A bomb-sniffing dog did not alert on anything explosive in the house, garage, or truck.  The police officers confiscated a laptop computer, a combined printer-copier, a partial roll of stamps similar to those used on the second letter sent to the sheriff, an unopened label maker, file folders that had been marked with labels created with a label maker, and manila envelopes similar to the one used for the first letter.  Most damning, they found a sheet of paper with indentations that appeared to match the diagram of the bomb sent to the sheriff.  They seized this sheet but not the sheets of paper below it.  They also found a rat trap and three mouse traps in the pantry and fishing line in his boat.  A trace evidence examiner testified that the chemical composition of the fishing line found in Paul's boat was indistinguishable from the fishing line wrapped around a bolt found at the scene of the explosion.

Paul was eventually arrested for the murder of Roberto Ayala.  A friend read about his fingerprints on the indented sheet in a local newspaper and asked him about it when he called Paul in jail.  Paul said the evidence was no big deal; he said the sheet was found in his house by the window, and he "probably leaned on it and opened the window."

11

*Forensic Analysis*

The forensic testimony provided the most compelling evidence against Paul. The prosecution called a litany of forensic experts connecting Paul to the sheet of paper with the indentations of the bomb diagram, the paper in the printer to the paper used in the diagram of the bomb, the ink in the copier to the ink used on the second letter and the diagram, the type of labels used in the letters and diagram to the type Paul used on his own files, and the fishing line found in his boat to the type of fishing line used in the bomb. Taken together, their expert opinions constitute substantial evidence from which the jurors could reasonably infer that Paul was the author of the incriminating letters to the investigators and that it was the author of those letters with the knowledge of the intricacies of the bomb who must have designed, created, and planted it.

A forensic document examiner compared the sheet of paper with the indentations that had been seized from Paul's residence to the diagram of the bomb mailed to the Colusa County Sheriff's Department. Most of the indented impressions found on the sheet of paper matched the lines in the bomb diagram. He explained that the indented sheet appeared to have been placed beneath the document that was actually written even though some of the lines did not align perfectly. The lack of complete alignment resulted from the diagram or indented sheet being moved, the diagram being drawn at different times, or a line being overwritten. He noted that in a stack of paper, indentations can appear five pages down.

Eight fingerprints and the left palm print lifted from the indented sheet of paper matched Paul's.

A document examiner from the United States Secret Service compared the ink from the documents sent to the sheriff's department with the ink on documents from the printer confiscated at Paul's house. He opined that the second letter and bomb diagram had the same physical, optical, and chemical profiles. In short, he could not tell them

12

apart.  He also noted that the second letter, bomb diagram, and indented sheet of paper had comparable levels of sodium, sulfur, and chlorine.

A trace evidence examiner found the fishing line recovered from Paul's boat had the same chemical composition as the line around the bolt found at the site of the explosion.  She concluded that all the samples came from the same spool or another spool having the same chemical composition and physical characteristics.  She also testified the labels on the envelopes sent to the sheriff were consistent with those on Paul's file folders, with the same type of polyester backing and the same type of acrylic-based adhesive.  In her opinion, the labels came from the same tape cassette or from another one with the same characteristics.

An explosive enforcement officer testified that booby trap devices are "victim-operated."  He explained that just above the pipe bomb was a "mouse-trap assembly" that was used as a trigger.  He described how the booby trap would detonate, as follows:

"So imagine you take a metal box, typical control panel, electrical, that has the lip that goes around, and you have that little washer pin in there so that the lip of the box, I imagine, the door to the box and the box itself has this little washer sandwiched in between them so that it can't fall down.  It's leveraged in between there.

"As soon as that door starts to open, that washer is free.  Once it gets free enough to the point, and that won't take a whole lot, that washer drops or is free, and then that bolt drops, pulls the line through the first nut on the top, pulls the nut or the line through the bottom nut over here, the second one, which yanks on this little trigger right there releasing the bale.  And this would be, in my explanation, it takes a little bit of time, but this is near instantaneously.  It's a very rapid event.  [¶] . . . [¶]

". . . The bale strikes the nail, and the nail strikes the primer, and this is all happening immediately.  And that primer is causing an immediate flash into the cavity of that pipe assembly, the pipe bomb itself, and initiates the explosive charge.  The bomb is set off."

13

The bomb also contained a plastic container filled with gasoline to ignite during the explosion and enhance the thermal effect. Thus the victim, according to the explosive expert, would be injured simultaneously by the explosion and the fire. And because the explosion would be instantaneous, the victim would still be in contact with the electrical panel and would be electrocuted.

In the explosive expert's opinion, the evidence collected from the scene of the explosion was consistent with the diagram of the bomb, including a bolt with the piece of fishing line, pieces of a sprayed-black plastic bottle, plastic wrap, and washers and bolts that might have been part of the bomb. Whoever drew the diagram, he believed, was "intimately familiar with the construction of that device."

The forensic evidence, including the indented sheet of paper with Paul's fingerprints on it, the ink and paper from his printer matching the ink and paper mailed to the sheriff, the matching fishing lines, and the presence in the farm shop of many of the materials needed to make the bomb, constitutes substantial evidence to support the inference the jury made that it was Paul who wrote the letters to the sheriff, and it was therefore Paul who planted the bomb that blew up Roberto Ayala, just as he had planned.

### 4. Motive

The prosecution need not, as we know, prove motive. (CALCRIM No. 370; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504.) Nevertheless, motive is relevant, and a strong motive provides powerful evidence. (*People v. Vereseneckockockhoff* (1900) 129 Cal. 497, 508.) Here the prosecution sought to prove that Paul disliked Roberto Ayala, believed he was a liability to the farm, and thought that his removal would allow Paul to assume greater managerial responsibilities. There is indeed sufficient evidence to support a reasonable inference that Paul had nursed a lifetime animosity toward nonfamily members his father appeared to favor. And Roberto Ayala, in particular, was the target of his wrath.

14

We have completed one-half of our job by presenting the circumstantial evidence from which the jurors could have reasonably inferred that Paul had the familiarity with Roberto Ayala's work routine and how to operate the irrigation pump as well as the opportunity to plant the bomb and the unique skill set in electrical and mechanical design to have constructed the victim-activated explosive device that killed him. We have outlined the chronology of the investigation and how it produced evidence that Paul was quick to alert the investigators to evidence suggesting that Peter bore Roberto ill will, that Peter had threatened Roberto, that Peter had been at the scene of the explosion the day before it happened, and that it was an explosion, not an accident. The forensic evidence, as we have described it, connects Paul to the drafting of the second letter and bomb diagram sent to the sheriff's department. The indented sheet had his fingerprints all over it, the paper matched paper from his house, the ink matched ink in the printer from his house, the labels matched his labels, and the fishing line attached to the bolt matched fishing line from his boat. The jury reasonably could have concluded that his conduct following the explosion was incriminatory—manufacturing spikes that were found in the road and taunting the police in a dramatic chase. And while it may be doubtful that Paul killed the farm's foreman to accelerate his own position given that his father had already decided to partner with him, he certainly felt aggrieved and humiliated that he had been denied the opportunity to become the foreman when he graduated from high school and that, throughout his life, those employees like Roberto Ayala who were not part of the Moore family were valued more and treated better than either Peter or Paul.

Having reviewed the evidence offered by the prosecution, we now turn to the evidence presented by the defense that Peter, not Paul, planted the bomb that killed Roberto Ayala, for he too appeared to disdain the man, he too had the opportunity and familiarity with the irrigation pump, he too had access to the area in which the bomb was planted, and he too had incriminating evidence on his computer hard drive. In addition, he had a violent disposition and leveled threats to harm not only Roberto, but his father,

his uncle, and many others who upset him. His reputation in the community would make Peter the more likely suspect than Paul.

**B.      Circumstantial Evidence Against Peter**

**1.      <u>Violent Disposition</u>**

There is an abundance of evidence to support the notion that Peter has been a bully his entire life and his relationships ended poorly. When asked if his temper had caused problems for him in the community, he testified, "I'm not the easiest guy to get along with." By his own account, his father not only physically abused him, but from the time he was eight or nine years old made him fight with other boys to resolve their conflicts. He was a boxer in high school. As an adult, he became a football coach but was fired for his aggressiveness toward a student. He was fired as the director of a duck club because he offended some of the members. And, of course, he was ostracized from the farm and estranged from his father. He remained so bitter toward his father he begged his grandmother to disinherit him. The day before the bombing, Peter wrote that an old friend, Bea, had told him she hated his father and "[s]o I think the world of Bea."

According to Consuelo Conedy-Ruiz, the wife of one of the farm workers, Peter intentionally ran over her dog and drove away. He never apologized, and her husband, Antonio Ruiz, demanded that she not confront him. Peter told Ruiz and Conedy-Ruiz he did not like Roberto, he was practicing karate to prepare him to fight Roberto, and he referred to Roberto as a "son of a bitch." In either June or July of 2012 Peter told Ruiz and his wife to forget everything he had told them a year earlier.

Peter loved to shoot ducks. Many years before the explosion, he set up two duck blinds in a field on the farm. After a few years, Martin Tucker told Roger that Peter and his friends were shooting every bird in the sky. As a result, Roger had the duck blinds removed. Peter was so angry he left a voice mail message for Tucker, threatening that he "was going to rip his head off and piss down his throat" or "shit down [his] neck." Peter

16

testified that he did not intend to literally rip off Tucker's head, but he did want to engage in a fistfight. Tucker reported the incident to the sheriff and to Roger.

Peter threatened both his uncle and his father. He threatened to "beat [his] dad's ass" on multiple occasions. He also threatened his Uncle Roger, despite the fact he believed Roger would be more fair to him than his father. Roger made two police reports based on Peter's threats to physically assault him.

Eduardo Ayala testified that he knew Peter characterized him and his coworkers as a lazy group of drug addicts and alcoholics who would ruin the Moore brothers' agricultural business. He assumed Peter was trying to get him fired.

Most significantly, Peter broadcast his contempt for Roberto. A month before the explosion, Roger learned from Paul that Peter threatened to injure Roberto. Peter texted, "When [Roberto's] wing is better, he's all mine." Peter testified that when he wrote the message he was planning to beat up Roberto. Roger encouraged Roberto to seek a restraining order against Peter, but Roberto declined. Peter testified he was going to physically beat up Roberto.

Peter testified that two months before the explosion, his father told Roberto that if Peter came on the farm, Roberto should have him arrested for trespassing. He also testified that Paul had told him that Roberto had said he was only good for picking up trash and that Roberto would be receiving Peter's inheritance. He explained that he had posted a message entitled "Horrible Tragedy" on a sports gambling Web site wherein he described the death of Roberto Ayala.

Peter's best friend, Blane Martin, countered this narrative. Instead, he agreed that the saying, "Don't let your bulldog mouth let your mockingbird ass get in trouble" applied to Peter. In other words, Martin believed Peter's "bark is much bigger than his bite." Martin had never seen Peter actually engage in any sort of violence.

17

## 2. Forensic Evidence

Peter's house was searched a few days after the explosion. He thought the police were there to search for medical marijuana he was growing. The investigators took possession of three computers and three cellular telephones. Prosecution experts did not find any evidence of value on Peter's devices.

During trial, however, the defense offered the testimony of an expert in forensic computer analysis. He discovered what the prosecution experts had all missed—that the user of Peter's computer had visited a YouTube rat trap video.

Roberto's seven-year-old son told the investigators and testified at the preliminary hearing that he did not move or drive the truck after the bomb exploded. For the first time at trial, however, he testified he got into the truck and tried to drive it. The defense argued that Peter had been present at the scene of the explosion.

## 3. Voice Mail Messages

On July 17 Roger gave the investigators two voice mail messages he had received from Peter. In the first message, Peter told Roger that the real reason Roberto's son was fired by another employer was that he was caught stealing and forging his time card, the same thing the "Ayala boys" had been doing to Roger for years. In the second message, Peter said he had worked for 21 years so he could have a chance to farm; that he wanted his grandfather's farm to stay in the family, but his father had disinherited him; that he and Roger were now "screwed" and he was not going to get a chance to farm; that he had never had a father except biologically; that his father was a "douchebag" and had never given him a penny; that Roger could not see the "Ayala boys over there ripping [him] off blind"; and that Roberto had his kid driving the harvester.

## 4. Aptitude

Peter had difficulty with reading comprehension. At trial he explained he had difficulty understanding the documents he was asked to review, but that he could understand an oral description of their contents. Martin opined that Peter was not

18

technically, with regard to electricity, or mechanically talented at all; rather, he was forgetful, had difficulty maintaining the tools he needed for his landscaping business, and suffered minor coordination problems. For example, Peter's hands shook as he tried to connect PVC (polyvinyl chloride) pipes and install sprinkler systems. He was able, however, to install electrical sprinkler systems. Peter testified he was not a trained welder, he was not talented when it came to anything mechanical, and the only electrical work he performed was the simple wiring of electrical sprinkler systems.

### 5. Familiarity and Opportunity

Peter was intimately familiar with the field where Roberto was blown up. In fact, he testified "[t]hat piece of property is my favorite piece of property that we own." It was in that field that he ran his duck club before Roger took down the blinds. He dropped his clippings from his landscape business 40 yards from the pump. And he drove his ATV over the field with his friend Blane Martin on a regular basis. Although he had used the irrigation pump years earlier when he was shooting ducks, the mechanism had been changed and he testified he did not know how to use the new apparatus.

Peter testified it had been 20 days since he had been at the location where the bomb had gone off. There is no direct evidence that Peter knew Roberto's precise work schedule or routine, but a jury could reasonably infer that he understood that a foreman's responsibility included adjusting the water levels on the rice fields. Moreover, he was aware of the 19 years Roberto had dedicated to the Moore brothers' farm and had watched at a distance as Roberto ascended to the position he coveted.

### 6. Motive

Motive is one of the elements the defense argued most vehemently. In Paul's view, it was Peter who had lost the most and had the most to gain by Roberto's demise. By July 2011 Paul had been reintegrated into the farm and had been promised a partnership with his father. Roberto was not an impediment to his ambitions. But Peter's situation was far different. He had not been allowed to work on the farm for over 21

19

years. Gus stood ready to arrest him for trespassing if he was found on the premises. He did not like Roger and Roger did not like him. While there is no evidence that he actually had been disinherited, Peter believed he had and that Roberto would be the recipient of his share of the farm. On July 12, 2011, Peter had texted Paul that he had been landscaping for 21 years, needed to get out, wanted to farm, was trying to get people to talk to Roger, and hoped that Paul would talk to Roger to help him get started farming. Paul therefore argued that he had no motive to kill Roberto, whereas Peter did. Roberto was Peter's nemesis, and it was Peter, not Paul, who stood to gain the most once he was removed.

## C.     Analysis

Based on Peter's violent disposition and the threats he leveled at Roberto, among others, the rat trap YouTube video found on his computer, his basic understanding of electrical devices sufficient to enable him to install electric sprinkler systems, his familiarity with the field and with Roberto's responsibilities, his opportunity to plant the bomb, and his compelling motive to remove him from the farm, Paul argued that Peter planted the bomb that Roberto activated when he opened the electrical box to adjust the water levels on the rice field. He insisted that Peter planted the indented paper and that his fingerprints were left on the top sheet when he placed his hand on it to adjust a window shade. He stressed that Peter's history of acting out with physical force, coupled with his hatred for Roberto and his lifelong ambition to work his grandfather's farm, constitutes overwhelming evidence that Peter was the murderer. More to the point, he contends the evidence we described above is not substantial when reviewed in the context of the entire record. That evidence, Paul argued, pointed to Peter's guilt beyond a reasonable doubt.

Paul was well represented at trial, and his lawyer effectively lodged these arguments, and many more, to the jurors. The case is a classic whodunit. And it is particularly challenging because, as Paul argues on appeal, there are no witnesses, no

fingerprints on any of the bomb parts, no DNA, no confessions, and no admissions. The evidence is all circumstantial. But it is the jury's prerogative, not ours, to weigh the evidence. The jurors had the opportunity to observe Paul throughout the trial and to assess Peter's credibility throughout his lengthy direct and cross-examinations. But apparently they had little difficulty reaching their verdict. They asked for the testimony of only one witness to be reread to them. Although the trial was lengthy, they took less than a day to deliberate. Our sole duty, as we wrote at the outset, is only to insure that there is substantial evidence to support the verdict this jury reached.

We have carefully evaluated the quantum and sufficiency of the evidence that it was Paul who murdered Roberto in the context of the whole record, and we have examined each of the pieces of evidence he contends proves that it was Peter who designed, built, and planted the victim-activated explosive device. The defense raised important questions and offered a more than plausible alternative theory, but those questions were answered by the jury and it rejected Paul's argument that Peter was the perpetrator. We simply cannot say the evidence that Paul possessed the unique skill set to build a bomb, that he had the requisite familiarity with Roberto's schedule and with the irrigation pump where the bomb was planted, of his fingerprints on the indented sheet that matched the bomb diagram and the remainder of the forensic evidence connecting his printer and his labels with the letter and diagram sent by the bomber to the sheriff, and of his suspicious behavior in framing his cousin and in manufacturing and planting the spikes in the road and chasing the investigators at high speeds, and his personal account of the lifetime of disappointment he felt in the way he had been treated relative to the way his father and uncle doted on Roberto, does not constitute solid evidence of credible and reasonable value to sustain the verdict. Simply put, the jury concluded beyond a reasonable doubt that based on this evidence, Paul was guilty of first degree murder. We must accept its determination.

## II

## Admissibility of Evidence

### *Prior Bad Acts*

Paul argues the trial court abused its discretion by admitting evidence he had wiretapped his ex-wife's telephone during divorce proceedings 15 years earlier and had made oxygen acetylene bombs 20 years earlier. He contends the evidence was too remote, was not probative of his knowledge of electrical circuitry or constructing sophisticated bombs, and was substantially more prejudicial than probative. In his view, the admission of such prejudicial evidence rendered the state proceedings fundamentally unfair and violated his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Again, the limited scope of appellate review presents an insurmountable obstacle. Paul concedes that the standard of review is an abuse of discretion, but he cautions us not to rely on the colorful descriptions and derisive boilerplates the Attorney General uses to describe abuse of discretion, including such catchphrases as a court abuses its discretion when the ruling is "arbitrary, capricious, or patently absurd," resulting in a "manifest miscarriage of justice." Rather, he insists the ultimate question is whether the court's ruling was unreasonable in light of the governing law and the facts presented. (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 737-738.) Without debating semantics, the point is that we must defer to the trial court's determination whether the evidence is substantially more prejudicial than probative unless the court has strayed too far from what is reasonable and sound. Evidence Code section 352 provides the framework: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In other words, the trial court is accorded considerable discretion to carefully balance the competing interests in admitting probative evidence and in excluding

evidence that unfairly prejudices a defendant, and an appellate court will overturn the exercise of discretion only when the trial court's assessment appears to exceed the bounds of reason. (*People v. Johnson* (2000) 77 Cal.App.4th 410, 417-419.)

Admission of character evidence, however, is subject to special rules. Our criminal justice system is predicated on the fundamental notion that a person accused of criminal conduct must be convicted based on evidence that he or she committed the alleged conduct and not merely based on evidence of a criminal disposition or a criminal reputation. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.) The Legislature therefore has declared that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

Nevertheless, the Legislature also recognized that some otherwise inadmissible character evidence should be considered by a jury because it is relevant to prove identity, intent, or knowledge. In those instances, a defendant's prior bad acts are admissible. (Evid. Code, § 1101, subd. (b).) The admissibility of uncharged acts " 'depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence.' [Citation.]" (*People v. Robbins* (1988) 45 Cal.3d 867, 879; see *People v. Kelly* (2007) 42 Cal.4th 763, 783.) Whether a trial court has erred in admitting evidence under Evidence Code section 1101 is also reviewed for an abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

**Wiretapping:** In opposition to the defense motion in limine to exclude the evidence of wiretapping, the prosecutor argued: "Defendant climbed a telephone pole and attached a wire to the line, running the wire to a recording device. The evidence will show that the explosive device in this case was housed inside a 480-volt high amperage

23

pump control panel.  Installing a device inside such a panel is a highly dangerous activity.

An individual would need prior knowledge of electric devices and electrical systems in

order to properly and safely install the device.  The wiretapping incident indicates

knowledge of electrical circuits, as well as the ability to alter and manipulate said circuits

while maintaining personal safety.  Therefore, the evidence shows a knowledge of, and

experience with, electric devices under [Evidence Code section] 1101[, subdivision] (b)

and should be admitted.”

Paul emphasizes that his ex-father-in-law offered the only evidence about the

wiretapping and his testimony was simply that Paul “put some kind of a recorder or a

similar device underneath her modular home where he could, from time to time, monitor

what the conversations were.”  Paul argues, therefore, there is no evidence that installing

a wiretapping device demonstrated any particular knowledge about electrical circuitry or

working with complex electrical devices.  It is speculative, according to Paul, to assume

that wiretapping a telephone is any more complicated than purchasing a “Radio Shack or

Spy Store device complete with user instructions for dummies [or] a DIY device.”

It is true that the prosecution did not elicit testimony from the ex-father-in-law or

from anyone else about what electrical knowledge was necessary to wiretap a telephone.

At trial there was no evidence Paul climbed a telephone pole to attach a wire to the line or

any other evidence as to how Paul actually wiretapped the telephone.  But the degree of

sophistication it takes to wiretap is not dispositive.  Whether wiretapping is relatively

simple or exceedingly complex, it takes a certain degree of knowledge to tap into

someone’s phone line.  All of these considerations could factor into the trial court’s

delicate weighing process.

The potential prejudice of admitting the evidence was slight.  Paul’s ex-father-in-

law testified briefly, and the description he gave certainly did not consume an undue

amount of trial time.  Having heard how Roberto Ayala had been burned and blown up,

24

the evidence of a simple wiretap would not have so outraged or incited the jurors as to put them at risk of wrongfully convicting Paul because of this prior act.

There is no question, however, that the evidence was remote in time. Nevertheless, there was probative value in establishing Paul's lifelong familiarity and experimentation with all types of electrical and mechanical devices. As a child he rigged his light switch; as a father he taught his son how to hardwire his car; as a farmer he designed a mud chisel, rice rollers, and a fertilizer aqua bar. Beyond those innocuous hobbies, he wiretapped a telephone and blew up a bomb. We cannot say the trial court abused its discretion by admitting evidence of a pattern of fascination and aptitude with building things, some requiring electrical aptitude and some that did not. Although none of the individual incidents when taken alone would have demonstrated the type of knowledge necessary to make and install a bomb in an electrical panel device, the jury was entitled to hear how cumulatively they were relevant to whether Paul had the requisite knowledge to install a victim-activated bomb.

The essence of Paul's argument is that the wiretap had minimal probative value because of the lack of evidence as to the quantum of knowledge necessary to build the bomb that killed Roberto. We agree the prosecution may have overstated the probative value by arguing the degree of sophistication a wiretap takes in the absence of evidence to support that claim. But that is not to say a wiretap does not have sufficient probative value to merit admission, and given the minimal risk of potential prejudice, the trial court did not abuse its discretion by admitting evidence that did offer some probative value into the extent of Paul's knowledge about building and connecting electrical and mechanical devices.

**The Oxygen-Acetylene Bomb:** Similarly, the evidence that Paul had mixed oxygen with acetylene to produce an explosion when he was in his early to mid-twenties also had some probative value about his knowledge, even if primitive, of bomb making. Again, Paul's critique is the same: that is, the prosecutor grossly exaggerated his

25

fascination with bomb making and extrapolated one incident into a proclivity to create multiple and more advanced explosive devices. This is an argument defense counsel had the opportunity to effectively rebut in closing argument. And, as with the admissibility of the wiretap evidence, the argument is simply a diminution of the probative value suggested by the prosecution; it is not that the evidence bore no probative value, just that it was substantially outweighed by the risk of prejudice.

The evidence demonstrates that Paul had, on at least one occasion, experimented with explosive substances. Thus it was relevant and probative of his knowledge of creating explosions. But the determinative question is whether the trial court abused its discretion by finding the risk of prejudice did not substantially outweigh whatever probative value the evidence had. The focus again, therefore, is not on just how probative the evidence was, but rather on how grave the risk of prejudice admission of the old incident presented.

We conclude the risk was very low. There was no undue consumption of time since Paul's ex-father-in-law explained what he knew about Paul's involvement in creating an explosion in a paragraph or two. Nor was there a terrible danger of unnecessarily inciting the jurors' passions. Paul and his young friend were burned in the explosion they caused, but their injuries paled by comparison to the injuries suffered by Roberto when the bomb he activated set him on fire and electrocuted him.

Without going as far as the prosecutor in overstating the probative value, therefore, we do conclude the risk of prejudice was so conspicuously slight that it did not substantially outweigh the probative value the explosion-making incident had in establishing that Paul did have some familiarity, even if rudimentary, with working with explosives. We conclude the trial court did not abuse its discretion by calculating the minimal risk of prejudice and finding the probative value was sufficient to justify the admission of the evidence. We are not at liberty to second-guess the trial court's careful and reasoned assessment, and because we find there is no abuse of discretion, there was

26

no error in admitting the evidence. Paul's trial was not fundamentally unfair, and he was not deprived of his constitutional right to due process.

**"My Life":** Paul maintains that the trial court abused its discretion by admitting the prosecution's evidence of a document extracted from Paul's computer entitled "My Life" because its probative value was outweighed by undue prejudice within the meaning of Evidence Code section 352. He argues that the trial court's error violated his right to a fair trial and due process of law under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Paul states repeatedly that he did not threaten Roberto Ayala in the entire document as if the document were irrelevant simply because he did not threaten to physically assault him. In the "My Life" document, as described above, Paul provides a litany of perceived wounds and transgressions he suffered throughout his life on the farm and many of the indignities he felt were a result of the privileges, trust, and respect showered on Roberto by Roger and Gus. Paul felt belittled as Roberto assumed what Paul believed was his own place on the farm. We agree with the trial court that the document was therefore relevant to prove motive. Paul was free to argue that the document itself proved he had no intention of harming Roberto because, even in his most private moments, he did not threaten him. But the document provided strong circumstantial evidence he secretly envied the position to which Roberto had ascended and the discomfort Roberto's presence continued to cause him.

Defense counsel argued the document should have been excluded because it was written at least 18 months before Roberto was killed and many of the events Paul described had occurred in his early childhood. She contended it was too remote to be sufficiently probative and too prejudicial to be admitted. We disagree. To understand if, why, and how Paul would have blown up Roberto, the prosecution attempted to tell the painful story of the men of the Moore family farm and their tortured relationships. Paul, through his own words, told that story from his perspective, and his perspective provided

27

the jury invaluable insight into his motive for committing such an atrocious act. The fact that the document described the history of the family only added to its probative value. And we do not accept the proposition that a document that was either written or transferred a mere year and a half before the blast was too remote in time. Paul's animosity toward Roberto and his feelings of humiliation and resentment were simmering for years, and who better to express his feelings, and inferentially his motive, to the jury than Paul himself?

We find no merit in Paul's objection to the admissibility of his own life story. A defendant's writings have been admitted to prove motive over defense objection. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) Because the "My Life" document was highly probative, it is not surprising or improper that the prosecutor quoted it in the opening of his rebuttal argument. Paul's voice was powerful circumstantial evidence the prosecution had every right to exploit. Of course, the evidence was damaging, for it confirmed the prosecution's basic theory of the case, that a disappointed, angry, and envious man killed the foreman who threatened him most in his father's eyes. The admission of the evidence was not only fair but essential in assuring the jury understood the depth of how aggrieved Paul felt and that Roberto was a major source of his humiliation and disappointment. The trial court cannot be said to have abused its discretion by admitting highly relevant evidence when the only prejudice is the fact the story Paul himself told was a damaging one.

### III

### Prosecutorial Sandbagging?

Paul formulates two attacks arising from the prosecutor's final argument in rebuttal. First, he complains the prosecutors sandbagged him by engaging one prosecutor, who played a more minor role at trial, to make a perfunctory opening argument, saving its genuine substantive attack by the prosecutor who conducted the bulk of the examination. Paul alleges the trial court erred by denying his request to offer a

surrebuttal to the second prosecutor's rebuttal and depriving him of the opportunity to offer a reply to the facts and arguments he had not raised in his own closing argument. Second, Paul claims the substance of the rebuttal argument constitutes prosecutorial misconduct. Eschewing the old formulation characterizing a prosecutor's behavior as "misconduct" and urging us to consider the more forgiving label of "prosecutorial error," the Attorney General defends the prosecutor's rebuttal argument and insists the court did not err by foreclosing the defense from making a surrebuttal argument as requested. We turn to counsel's arguments, the objections that were lodged, and the trial court's rationale in denying the defense request to make a surrebuttal argument and denying its later motion for a new trial.

We accept for purposes of this issue the trial court's characterization of the defense closing argument. The court summarized what it perceived was a two-part argument: first, that Paul had no part in the killing and had no motive to kill Roberto because everything was rosy for him at the farm and he had worked his way into a happy partnership with his father; but second, his cousin Peter, who was bitter and estranged from the farm he loved, was a plausible bomb builder because he was capable of constructing the simple explosive device in question, particularly with the assistance of the YouTube video found on his computer. The trial court agreed with the prosecutor's position that the defense argument put in issue virtually all evidence that tended to show Paul's motive, technical skills, and past related actions and opened the door to fair comment on any and all evidence tending to link him to the crime. Thus, the court disagreed with Paul's threshold argument at trial that the prosecutor's rebuttal was improper because it exceeded the scope of the defense closing argument.

We agree with the trial court. Whether or not there is some authority to support the questionable proposition that a prosecutor's rebuttal is limited by the scope of the facts and evidence argued in the defendant's closing argument, the prosecutor did not introduce evidence outside the record or float a completely new theory of guilt. To the

29

contrary, the prosecutor did nothing more than marshal validly admitted evidence to counter defense argument: that is, the prosecutor referred to wiretapping evidence to demonstrate that Paul had superior technical skills to Peter and to his "My Life" entries to demonstrate he had a motive to kill Roberto, based on a lifetime of indignities and slights he felt on the farm. Thus, we do not address the theoretical question as to whether there is some line a prosecutor may not cross during rebuttal argument.

Beyond the substance of the arguments, Paul contends the prosecutors sandbagged him by withholding the most powerful evidence until rebuttal and depriving him of the opportunity to answer that evidence. Defense counsel, anticipating the very strategy the prosecutors ultimately used, complained to the trial court that the first prosecutor offered only a short opening argument, whereas the second prosecutor had argued for over two hours when she once again objected to the sandbagging. She thereafter requested the opportunity to offer a surrebuttal. On appeal, Paul challenges the court's denial of her request.

Whether we conclude that despite our reservation the trial court did not abuse its discretion or that, even if there was an abuse of discretion, the failure to allow surrebuttal was harmless beyond a reasonable doubt, our rationale is essentially the same. The prosecutor did not rely on any evidence outside the record, nor did he raise any new theory. The jury was well acquainted with the wiretapping evidence as well as with Paul's description of his life. Nothing precluded defense counsel from confronting that evidence in her closing argument. The fact that the prosecutor chose to highlight the damaging evidence only in response to the defense claims that Peter, not Paul, had killed Roberto Ayala and that he had no motive or nothing to gain from the killing was a strategic choice the prosecutors made. We cannot say the trial court's denial of defense counsel's request for surrebuttal constituted an abuse of discretion under these circumstances, and we also cannot say that additional argument on the same themes

already argued would have changed the jurors' finding that Paul was guilty beyond a reasonable doubt.

But Paul insists the prosecutor's rebuttal constituted error, even if we assume it was not intentional. The trial court rejected Paul's allegations, most of which are a repackaging of the arguments we have already addressed. We will not repeat what we have already said about the prosecutor's references to either the wiretapping or the "My Life" document but will examine Paul's other allegations of prosecutorial error.

Paul objects to the prosecutor's use of a DNA analogy. A document examiner expert testified at trial that the paper used in the second letter sent to the sheriff, the diagram, and the indented paper were chemically indistinguishable. The prosecutor argued to the jury that scientific experts often use "science speak" or "nerd speak" to hedge what they are really saying. As an example, he referred to DNA experts who do not say something is a positive match or is definitely someone's DNA but who give possibilities larger than the number of people who ever lived on earth. Thus, he was suggesting by analogy that the document examiner could not say the papers were "a positive match." The trial court rejected the defense claim that the prosecutor improperly had compared paper stock analysis to DNA analysis when there was no DNA analysis in evidence.

Paul maintains the prosecutor's comparison to DNA analysis imputed an accuracy to the paper and ink analysis that was not in evidence, and therefore it was error to allow the prosecutor to argue the ink, paper, and labels were "matches." We agree with the trial court that the argument was permissible as a mere example or analogy. Considered in context, there is no danger the jurors were misled or that the document examiner's expert testimony was falsely elevated to the stature of DNA evidence.

The prosecutor characterized Paul's wiretapping of his ex-wife as "creepy" and "really unusual," and stated he taunted his ex-wife's parents by telling them about the wiretapping. This characterization, according to Paul, sought to convince the jury he was

31

a creepy person and, as a result, had a propensity to commit bad acts. It was improper in Paul's estimation because the wiretapping evidence was admissible solely to prove his technical knowledge, yet the prosecutor transformed it into improper character evidence. The trial court sustained the defense objection to the prosecution's characterizations, thereby limiting the prejudicial effect of the alleged prosecutorial error. Paul insists the limiting instruction could not cure the prejudice.

In denying Paul's motion for a new trial on this ground, the trial court stated that the prosecutor's "offhand and brief comment" could not be fairly construed as arguing character. We agree. The jury was properly reminded to consider the evidence solely for its tendency to prove Paul's knowledge of electrical and technical devices. Given the brevity of the comment, we believe Paul grossly overstates its potential danger and conclude there was no prosecutorial error.

Nor do we find the prosecutor's equally innocuous statement that there is "no such thing as a prosecution witness" another example of prosecutorial error. We concur with the trial court's analysis that "[t]his comment can, in the context of a case where the prosecution presented dozens of witnesses over several weeks, only fairly be understood as a comment that witnesses can be called by either side. Clearly the jury was aware of which witnesses had been called by which side, and such a statement could not reasonably mislead any juror on that point."

We need not consider Paul's allegation that the accumulation of errors was prejudicial even if taken individually they were not. We have found no error at all, and therefore there are no errors to accumulate. Paul was afforded a fair trial. His trial lawyer provided excellent representation and advocacy. But 12 jurors of Paul's peers found that the circumstantial evidence proved beyond a reasonable doubt that he murdered Roberto Ayala and we must respect their verdict.

## DISPOSITION

The judgment is affirmed.

                                    RAYE        , P. J.

We concur:

               BLEASE      , J.

               NICHOLSON  , J.