[Crim. No. 5532. In Bank. Apr. 2, 1954.]

THE PEOPLE, Respondent, v. JAMES FRANKLIN WOLFE et al., Appellants.

Anthony J. Scalora, under appointment by the Supreme Court, for Appellants.

Edmund G. Brown, Attorney General, Doris H. Maier, Deputy Attorney General, J. Francis O'Shea, District Attorney (Sacramento), and Edward L. McCarthy, Deputy District Attorney, for Respondent.

CARTER, J.—Defendants James Franklin Wolfe and Joseph Johansen, while confined in Folsom State Prison serving life sentences, were charged by indictment with the murder, on May 8, 1953, of one Harold Stricker, also an inmate of Folsom, and in Count II with a violation of section 4500 of the Penal Code. They entered pleas of not guilty, and not guilty by reason of insanity, to Count I, and trial by jury was ordered. Subsequently, the plea of not guilty by reason of insanity was withdrawn, and Count II was, upon motion, set aside. After trial by jury a verdict of murder of the first degree was returned as to both defendants and the penalty was fixed at death. Defendants' motions for a new trial were denied. The appeal is automatic (Pen. Code, § 1239(b)).

On May 7, 1953, Stricker and Johansen had an argument over a game of dominoes. Stricker, at that time, was apparently very angry and threatened to slap and strike Johansen, and to "get" both Johansen and his cellmate, Wolfe, if they came out in the yard the next morning. Stricker called both defendants vile names and told Johansen he would "slap the . . . out of him." That night in their cell both defendants talked the matter over; another inmate informed them that Stricker had a knife and was going to "get" both of them the next morning. Defendants discussed getting knives with which to kill Stricker; the possibility of being caught at it and receiving the death penalty was discussed between them. They testified that they had decided that, despite the penalty, they thought it was better to get Stricker before he got them. The next morning they procured knives from an unidentified source and, after again talking it over, walked around the prison yard watching Stricker who was playing dominoes. The only conversation defendants had with Stricker that morning was when Wolfe asked him if he were going to play dominoes and Stricker's reply that he was. They testified that they saw Stricker go in one of the prison buildings and come out with a jacket on; that they thought he had gotten a knife; that they walked around and finally decided they would get Stricker before he got them. The defendants approached Stricker, who was sitting down with his back toward them, and between the two of them stabbed him some seven times. Medical testimony showed that any one of these knife wounds could have caused death. Johansen's knife was found in the back of the deceased. Several guards were present at the time of the crime and testified to the manner in which defendants stabbed Stricker, and that no knife was found in Stricker's possession. Defendants

testified that they knew the guards were there and watching them; that they decided it was better to get Stricker at that time because if they were caught with the knives it would mean six or seven months in "segregation" and that Stricker would then build up his reputation for violence by saying they were "weak" and "scared" and that when they got out of segregation, he would still get them. Several inmates testified to the domino argument on the 7th and that Stricker's reputation for violence was bad and that he was very belligerent.

Defendants argue that the prosecuting attorney was guilty of prejudicial misconduct in two instances. ■ Their first contention that it was prejudicial error for the prosecution to ask defendant Johansen if he left his knife in the victim's back, is without merit. The deputy district attorney asked Johansen, "[W]hat happened to your knife?" to which Johansen replied, "It was left in the *victim's* back." The next question was, "Did you leave it in the victim's back?" to which defendant Johansen replied, "Yes." There was no objection by defense counsel, nor was there any motion to strike. It is next argued that the use of the quoted expression assumes the guilt of the defendant. *People* v. *Williams* (1860), 17 Cal. 142, relied upon by defendants is not in point. There, the trial court, in instructing the jury, said, "The fact that the deceased was a Chinaman gave the defendant no more right to take his life than if he had been a white person; nor did the fact, if you so find, that the defendant was seeking to enforce the collection of taxes against another Chinaman, *or even against his victim,* give the defendant any right to take his life. . . ." (Emphasis added.) This court, in reversing, held that the instruction assumed that the deceased was wrongfully killed when that very issue was involved and that "even an equivocal expression coming from the *judge,* may be fatal to the prisoner." (Emphasis added.) In the present case, the expression did not come from the judge, but from the prosecuting attorney without objection by defense counsel or motion to strike being made, and the jury was instructed that it was the sole judge of the value and effect of the evidence; that it could not convict a defendant upon mere suspicion; that the prosecution was "bound to establish the guilt of a defendant beyond a reasonable doubt, and unless the prosecution does so, then it is your duty to find the defendant not guilty."

■ The second instance in which the prosecution is said to be guilty of prejudicial misconduct was in the closing

argument to the jury. The following portion of the argument was made over repeated objections by defense counsel that it constituted prejudicial error. "Ladies and gentlemen, in relation to that alleged argument that occurred on the afternoon of May 7th, the one in which Wolfe and Johansen say led up to this killing, they said they had Mr. Farrington, Marty Farrington, come down and testify and he said he was playing dominoes, Mr. Stricker was playing dominoes, a man by the name of Jack Garner was playing dominoes. They were all together when this argument also took place. Why was not Mr. [G]arner brought down by the defense to testify as to what occurred, to testify as to the argument? He was seated right at the table there. Is it possible, ladies and gentlemen, that Mr. Garner was honest enough that he wouldn't come down and perjure himself? Is it possible that that is the reason that he was not brought down by the defense? Why didn't the People bring them down? Well, ladies and gentlemen, how many convicts do you think will testify on behalf of the People in a case like this? How many convicts do you think are willing to risk their lives in order to see justice done? You know that they are few and far between, and you know that if any man, any convict came down here and testified against Mr. Wolfe and Johansen he would be setting himself up for a knife in his own back. You know that because you know as common, intelligent people that a stoolie, a man who informs or testifies against his fellow convict is the most hated, the most despised man among convicts.

"Ladies and Gentlemen, I wonder if Marty Farrington was actually one of the four who were seated at that table playing dominoes that afternoon. I really wonder about that. Mr. Johansen said that the people who were playing when that argument took place where Mr. Garner, Mr. Stricker himself, and a man called Whitey *Knoles* [sic]. Whitey Knoles—now, Knoles is not anything like 'Farrington.' It is altogether different. He couldn't make a mistake like that. If Farrington were actually the one who were playing, he couldn't have done it, ladies and gentlemen. So I seriously put it to you, was Marty Farrington actually seated at that table. Does he know anything about it at all? And if he was playing, what about the rest of the convicts who came down and testified? Ladies and Gentlemen, there is testimony here that a man by the name of Clark was assaulted by Mr. Stricker the same day. Why was not Mr. Clark brought down to testify as to—— [Objection by defense

counsel that such a procedure would have been improper to which the Court replied that the jury would decide strictly in accordance with the evidence]. "The reputation of Mr. Stricker must have been known to Mr. Clark as a fellow inmate. The reputation of Mr. Stricker, ladies and gentlemen, must have been known also to Tex Goodman. Why wasn't he brought down? . . . [Cited by defense counsel as prejudicial misconduct to which the Court replied that it was instructing the jury to decide the case strictly in accordance with the evidence.] Ladies and Gentlemen, where are the men that Stricker was allegedly talking to on May 8th, the three men that Mr. Johansen says he knows but he doesn't know their names? Why weren't they brought down? Why didn't the people bring any of these men down? Well, I think I have explained that to you pretty clearly already. . . ."

Defendants contend that this argument told the jury that had certain witnesses appeared they would have testified for the People but if they had so done, they would have risked being killed by their fellow convicts. It has been held prejudicial misconduct and prejudicially erroneous for the prosecution to comment on the failure of a witness to appear and that had he done so, he would have testified in a certain manner or to facts not in evidence (*People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]; *People* v. *Evans,* 39 Cal.2d 242 [246 P.2d 636]; *People* v. *Cook,* 148 Cal. 334 [83 P. 43]; *People* v. *Glass,* 158 Cal. 650 [112 P. 281]; *People* v. *Smith,* 121 Cal. 355 [53 P. 802]). Part of the argument here was directed toward the failure of the defense to produce a witness who was allegedly playing dominoes with Stricker and defendant Johansen on the day before the crime. It was said he was too honest to perjure himself by testifying for the defense that Stricker had made a threat against the lives of the two defendants and that he was afraid to testify for the prosecution because of what might thereafter happen to him at the hands of his fellow prisoners. Another part of the argument was to the effect that two prisoners whom the defense claimed Stricker had assaulted (in an endeavor to show the reputation of the deceased for violence was bad) were not produced as witnesses; still another part of the argument questioned whether one Farrington, who was a witness, had really been present at the time as he said he was or whether, as testified to by Johansen, it had been one Whitey Forbes (referred to in the argument as Whitey

Knoles). There was testimony by an inmate that "Whitey" and "Marty" Farrington were the same person. Whether or not Marty Farrington and Whitey were the same person was a question of fact for the jury since the testimony on the subject did nothing more than create a conflict in the evidence. It was, however, highly improper for the prosecution to comment on the failure to produce certain witnesses and to state that the witnesses, if produced, would have been too honest to perjure themselves for the defendants and afraid to testify for the People. Such conduct should not be condoned, and is not here approved. Had the People desired to have the men alluded to produced as witnesses, the procedure common in such cases was open. It is only because of the overwhelming evidence of guilt in this case that we do not declare such misconduct sufficiently prejudicial to warrant a reversal. But we cannot say, after an examination of the entire cause, that the remarks of the prosecuting attorney were so prejudicial to defendants as to result in a miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Dail,* 22 Cal.2d 642, 659 [140 P.2d 828]; *People* v. *Estorga,* 206 Cal. 81 [273 P. 575]; *People* v. *Adams,* 92 Cal.App. 6 [267 P. 906].)

It is next contended that the trial court erred in failing to give certain requested instructions. ▮ The first assignment of error is that the court refused to instruct the jury that a confession must be free and voluntary. Immediately after the killing, defendants were taken to a room controlled by prison officials before a member of the district attorney's staff, a detective and a court reporter. Both defendants answered questions concerning the events of May 7th and 8th; both defendants insisted that the killing was done because Stricker was out to "get" them. Merrick, the court reporter present, testified upon questioning by the prosecution that the defendants' statements were not made under any promise and that no threat or force was used on either of them. The questions and answers were then read to the jury without objection by defense counsel. Both defendants testified at the trial and their testimony covered the same subject matter as that which is now objected to as a confession involuntarily given. While it would have been better practice to have instructed the jury as to admissions and confessions, no such instruction was requested by the defense, although it was requested by the People. In view of the fact that defendants testified at the trial in the same vein as

the answers they had given just after the commission of the crime and defense counsel testified that he had no objection to the reading of the transcripts of defendants' statements, no prejudice could have resulted from the failure to so instruct. In *People* v. *Barnes*, 30 Cal.2d 524, 529, 530 [183 P.2d 654], a police witness was examined for the purpose of showing that the defendants' confession had been voluntarily given. Defense counsel then stipulated that there had been no promises, no coercion and no violence. The trial court there refused to instruct the jury that it was its province to determine whether the confession had been freely and voluntarily given. We held that the stipulation "in the absence of extraordinary circumstances, removes from controversy the question of coercion." It was pointed out that there, as here, the jury was instructed merely that it was the judge of the credibility of the witnesses and of the weight of the evidence. In the case at bar, the jury was also instructed that oral admissions or statements made by a defendant at a time when he was not under oath and not testifying as a witness in the case were to be viewed with caution because he might not have understood the questions and for "other reasons." In the Barnes case we held that "It would have been better practice to instruct them [members of the jury] that they were the exclusive judges as to whether or not the confession was true [as distinguished from its voluntary character]. . . . The failure of the court to give such an instruction, however, did not prejudice defendant." We there concluded that the evidence was sufficient to sustain the verdict independently of the confession. (See, also, *People* v. *Hurst*, 36 Cal.App.2d 63 [96 P.2d 1003].) There is merit in the People's argument that, in the case at bar, the defendant's pretrial statements constituted admissions rather than confessions in that defendants, at all times, insisted that the killing had been done in self-defense. In *People* v. *Fowler*, 178 Cal. 657, 666 [174 P. 892], the court after commenting upon the evidence, said: "Thus the statement itself would show that the killing was done by defendant in his lawful self-defense. Such an admission, as we have shown, is not a confession of the crime, or an acknowledgment of guilt thereof. It is a declaration of innocence; that no crime was committed; that the killing of Duree was a justifiable homicide and not murder or manslaughter." (See, also, *People* v. *Arnold*, 108 Cal.App.2d 719, 723 [239 P.2d 449]; *People* v. *Cryder*, 90 Cal.App.2d 194, 203 [202 P.2d 765].) Aside

from this, however, here, as in the Barnes case (*supra,* 30 Cal. 2d 524, 530) the evidence was sufficient, independently of the confession (or admission) to sustain the verdict.

 The second assignment of error in this respect is the failure to give an instruction on manslaughter. The jury was instructed on first and second degree murder; on self-defense; on justifiable homicide; on premeditation; on malice, both express and implied. It would appear that there was no evidence in the record to support an instruction on manslaughter. Defendants' testimony showed that there was no sudden quarrel or heat of passion at the time of the crime so as to justify an instruction on voluntary manslaughter; that there was sufficient evidence surrounding the crime itself to show that an instruction on involuntary manslaughter would have been improper.

In *People* v. *Mott,* 211 Cal. 744, 748 [297 P. 23], the court, in commenting on the appellant's refused instruction on manslaughter, said, "In the instant case, however, the defendant offered neither plea nor evidence as to any fact which would have justified the jury in finding the defendant guilty only of manslaughter. The only justification which the defendant offered for his otherwise deliberate and premeditated murder was the plea of self-defense. If the jury found that his testimony with regard to that plea was wholly unsupported and unbelievable it had no other alternative than that of finding him guilty of a wilful, unprovoked and cold-blooded murder. Under such circumstances the authorities fully sustain the trial court in refusing to give to the jury an instruction concerning or defining manslaughter. [Citations.]" (*People* v. *Sutic,* 41 Cal.2d 483, 493, 494 [261 P.2d 241]; *People* v. *Alcalde,* 24 Cal.2d 177, 188 [148 P.2d 627].)

Defendants argue that the jury should have been instructed that adequate provocation may reduce an intentional killing from murder to manslaughter, and that it may also raise a reasonable doubt in the minds of the members of the jury that the defendants formed the intent to kill and carried it out after deliberation and premeditation. Defendants rely upon *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1], for the proposition that ". . . the existence of provocation which is not 'adequate' to reduce the class of the offense may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." (*People* v. *Valentine, supra,* 28 Cal.2d 121, 132.) It is argued, with merit, that the jury

was not instructed as to what constitutes sufficient provocation to reduce the crime from murder of first degree to that of the second degree. The jury was instructed fully, in accordance with the recent decisions of this court, as to both first and second degree murder. In the instruction on the difference between first and second degree murder, the jury was told that "It [murder of the first degree] must be formed upon a pre-existing reflection *and not upon a sudden heat of passion or provocation or other circumstance* sufficient to preclude deliberation and premeditation. . . ." (Emphasis added.)

In the Valentine case (*supra,* 28 Cal.2d 121) there was a quarrel immediately preceding the killing. In that case, erroneous instructions were given in several instances as the court pointed out at page 130: "In three essential and fatal respects the instructions given in this case resemble the instructions condemned in *People* v. *Thomas* (1945), 25 Cal. 2d 880 [156 P.2d 7]: (1) The jury were told that the existence of a specific intent to kill (which, of course, exists in voluntary manslaughter and in second degree murder as well as in some types of first degree murder) constitutes a homicide murder of the first degree; (2) the effect of provocation and passion as reducing the class of a homicide from murder to manslaughter was emphasized and the effect of provocation and passion as possibly precluding or making doubtful the formation of a deliberate and premeditated intent to kill was ignored; and (3) the jury were told, in effect, that the burden of proving circumstances which would mitigate the offense from murder of the first to murder of the second degree was upon the defendant." In the case at bar, no complaint is made that the instructions given were erroneous, but only that instructions on manslaughter and provocation should have been given. From the facts as testified to by defendants themselves, it would appear that they had discussed killing Stricker the night before the crime was committed and again on the day of the crime just before breakfast. It would appear, from defendants' own story, that the crime was either murder of the first degree, or a homicide committed in self-defense and justifiable as such. There was here no evidence of a sudden quarrel or any such passion as would make "doubtful the formation of a deliberate and premeditated intent to kill." (*People* v. *Valentine, supra,* 28 Cal.2d 121, 132.) The jury was fully and fairly instructed on the law of self-defense and the fear necessary to justify a homicide.

If the jury, after being fully advised on the law of self-defense, did not believe that "the circumstances [were] such as to excite the fears of a reasonable man placed in a similar position . . ." it could do no less than follow the law as set forth in the instructions relating to murder of the first degree, since defendants' own testimony negatived the theory that they were provoked, or so under the influence of passion as to make it doubtful that they could have formed a deliberate and premeditated intent to kill. It is settled law that instructions must be responsive to the issues which are determined by the evidence. The record here does not bring the case within the factual situation presented by *People* v. *Valentine, supra,* where the killing was committed during a sudden quarrel and where the deceased had been guilty of making accusations against the defendant within a few moments of the commission of the crime. In addition, other erroneous instructions in the Valentine case added to the error heretofore discussed. We said in *People* v. *Thomas,* 25 Cal. 2d 880, 903 [156 P.2d 7], "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought *but without premeditation and deliberation.*

"Murder of the second degree may be defined as the unlawful killing of a human being with malice aforethought but which killing is not perpetrated by means of poison, or lying in wait, or torture, is not wilful, deliberate *and* premeditated, and is not committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem. (See Pen. Code, §§ 187, 189.) It is apparent from the facts previously recited that the homicide in this case, if it was murder at all, was murder of the second degree unless the killing was 'wilful, deliberate and premeditated.' *The existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to premeditation and deliberation in forming the specific intent to kill, as well as in regard to the existence of malice* (Pen. Code, § 188), *constitute questions of fact for the jury and they should have been so advised."* (Emphasis partially added.)

In the Thomas case, as well as in the Valentine case, the murder occurred during a sudden quarrel. In the Thomas case, the question was presented whether the defendant had *previously* formed an intent to kill. In both cases, manslaughter instructions were given; in both cases, murder of the first degree was erroneously defined for the jury; in both cases there were doubtful instructions concerning the burden of proof; in both cases, the evidence was in substantial conflict. In the case at bar, there is no conflict in the evidence; no instruction was given on manslaughter; no sudden quarrel was involved; the instruction on murder of the first (as well as of the second degree) was correct, and is not questioned. The question for determination, as it appears to us, is whether the record shows *any* evidence which would warrant an instruction informing the jury that provocation insufficient to reduce the crime from murder of the first degree to manslaughter might yet be sufficient to reduce the crime from first degree murder to that of the second degree. ▉ We are of the opinion that the evidence of a quarrel the day before the killing, together with the evidence showing that the deceased had procured a knife and had threatened to kill the defendants justified the instruction on self-defense which was defendants' theory and which was fully given to the jury. ▉ We are unable to see how the evidence of the quarrel and the threat on the day before the killing *together* with the facts surrounding the crime (the lack of conversation between the deceased and the defendants; the fact that decedent was seated, with his back to the defendants, playing dominoes with other prisoners) could be considered as sufficient to support a verdict of second degree murder. In other words, we feel that the facts of this case would not support a conclusion, or justify an instruction, to the effect that there was sufficient provocation to reduce the degree of the crime to second degree murder. The facts show that the killing was either done in self-defense, or that it was a deliberate and premeditated murder.

In view of the evidence presented, the errors complained of are not of sufficient gravity to have resulted in a miscarriage of justice (Cal. Const., art. VI, § 4½) and thus warrant a reversal of the judgments.

For the foregoing reasons, the judgments and orders denying defendants' motions for a new trial are therefore affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.