Filed 10/26/22  P. v. Barnett CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDREW STANTON BARNETT,<br><br>Defendant and Appellant. | B313860<br><br>(Los Angeles County Super. Ct. No. BA492503) |

APPEAL from an order of the Superior Court of Los Angeles County, Robert C. Vanderet, Judge.  Affirmed.

Micah Reyner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet Deputy Attorney General, for Plaintiff and Respondent.

During a minute-long fight, defendant and appellant Andrew Barnett (defendant) stabbed a man outside a hotel where defendant was then living. A trial jury convicted defendant of assault with a deadly weapon. We consider whether the trial court prejudicially erred in any of three asserted respects: by declining to instruct the jury it must be unanimous on the act constituting the assault, by denying defendant's motion in limine to prevent the prosecutor and witnesses from referring to the man defendant stabbed as "the victim," and by instructing the jury in a manner that would in theory permit it to find the knife defendant used was an inherently deadly weapon.

## I. BACKGROUND

### A. *The Offense Conduct*

In January 2021, defendant was staying with his mother, Darlene Hoopii (Hoopii), at the Rivers Hotel, a single-room occupancy (SRO) residence in downtown Los Angeles.

A man known to many only by his first name, "Gabriel," started frequenting the Rivers Hotel around the summer of 2020. Hoopii believed Gabriel was destructive and under the influence of drugs, and he tried to get into Hoopii's room at around 3 or 4 a.m. one night.[1] Another resident of the Rivers Hotel, Leon Clark (Clark), also believed Gabriel was a menace and under the influence of methamphetamine.

On January 7, 2021, Gabriel was loitering in the area in front of the Rivers Hotel. Manolo Martinez, a security supervisor for SROs including the Rivers Hotel, responded to two complaints that Gabriel was trying to obtain access to the building that day.

---

[1] Defendant was aware Gabriel tried to enter Hoopii's room.

2

Martinez confronted Gabriel twice and told him he could not be in the area. Gabriel was hostile, physically aggressive, and cursed at Martinez.

Later that afternoon, Gabriel was lying in the alcove outside the front door of the Rivers Hotel. Defendant approached the Rivers Hotel from the sidewalk and walked into the alcove. Defendant walked up to Gabriel while holding a sheathed knife and poked him, causing Gabriel to stir and raise a hand toward defendant. Defendant then unsheathed the knife and jabbed it toward Gabriel. Gabriel stood up and moved forward slightly, and defendant backed up. The two then appeared to have words, and defendant walked toward Gabriel again—still with knife in hand.

Gabriel pushed defendant out of the alcove and onto the sidewalk. The two men tussled on the ground and defendant maneuvered so that he was standing while Gabriel was still on the ground. Defendant then swung down with the knife and stabbed Gabriel multiple times. The two men separated at that point, and walked away in different directions.

Defendant returned to his mother's room and called 911. Defendant told the 911 operator he had just stabbed someone. Defendant reported the person tried to "come at [him]" and stated he (defendant) had acted in self-defense.

Los Angeles Police Department officers responded to the scene. Defendant approached them and admitted to stabbing Gabriel. Defendant informed the police that the knife he used was in Hoopii's bathroom sink and accompanied them to her room to retrieve it. Defendant told the police Gabriel had been causing trouble at the Rivers Hotel and had previously tried to break into Hoopii's room.

3

The police found Gabriel lying on his back on a street corner, bleeding.  He identified himself as Gabriel Ortega and he was transported to the hospital for treatment of three stab wounds to his right shoulder (which the hospital stapled shut) and a cracked shoulder blade.

A police officer attempted to speak to Gabriel at the hospital, but that was not possible due to COVID restrictions.  The officer asked hospital staff to provide Gabriel with his contact information, but Gabriel never contacted him.  The officer was unable to confirm Gabriel's last name was Ortega, or to otherwise confirm his identity using his name and birthdate.[2]

B.      *The Criminal Proceedings Against Defendant*
The Los Angeles County District Attorney's Office filed a one-count information against defendant charging him with assault with a deadly weapon (a knife) in violation of Penal Code section 245, subdivision (a)(1).

Prior to the commencement of trial, defendant filed a motion in limine asking the court to preclude referring to Gabriel as the "victim" because the appellation would be unduly prejudicial.  The trial court denied the motion and explained the jury would be instructed about the presumption of innocence.[3]

During trial, the prosecution presented testimony from several police officers and admitted in evidence surveillance footage from the Rivers Hotel that captured the assault, footage

---

[2]     A police report prepared in connection with the incident identified Gabriel as "John Doe."

[3]     True to its word, the court so instructed the jury before opening statements and again at the conclusion of trial.

4

from police officers' body worn cameras, and an audio recording of defendant's 911 call. Hoopii, Clark, and a medical expert, Dr. Ryan O'Connor, testified during the defense case.

During the prosecution's opening statement, and as permitted by the trial court's in limine ruling, the prosecutor referred to Gabriel as "the victim." During questioning, the prosecutor and the LAPD witnesses also referred to Gabriel as "the victim." During closing argument, the prosecutor referred to Gabriel variously as "Gabriel," "Mr. Ortega," and "John Doe."

The prosecutor also discussed the attack itself during closing argument, describing the altercation as a "one minute-long . . . attack that occurred on Gabriel where multiple assaults with a deadly weapon occurred." The prosecutor said "it is one continuous attack but there are multiple assaults that occur during this attack";[4] the prosecutor also clarified "there is only one assault with a deadly weapon charged in this case."

---

[4] The prosecutor broke the single charged assault into four component assaults: (1) defendant takes out the knife and stands over Gabriel while he lays on the ground; (2) defendant jabs Gabriel twice as he is getting up the first time; (3) defendant lunges at Gabriel with the knife; and (4) defendant stabs Gabriel. The prosecutor argued the jury did not have to unanimously agree all four of these components occurred. As the prosecutor put it, "some of you might believe all four assaults happened. Some of you might believe some assaults happened, some were not assaults, right? That only the stabbing was an assault or that only two of those four qualify under these elements as an assault." The prosecutor also stated, "the key is you do not have to all unanimously agree on which one of those was an assault." The prosecutor said again that as long as all the jurors agreed an

Defendant objected that the prosecution's argument misstated the law. Defendant argued there was a "unanimity issue" and the court should instruct the jury that it must unanimously determine what act constituted the charged assault. The prosecutor countered that there was a continuous course of conduct and the jurors therefore did not have to agree on which individual component of the conduct was an assault. The trial court agreed it was a continuous course of conduct and did not instruct on unanimity.

Before the jury retired to deliberate, the trial court instructed the jurors (among other things) that "[a] deadly weapon is any object, instrument or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."[5]

The jury found defendant guilty of assault with a deadly weapon. Defendant moved for a new trial and argued he was prejudiced by the lack of a unanimity instruction. The trial court denied the motion, stating a rapidly occurring series of attacks in a compressed time frame should be seen as one assault. The court did recognize the People created ambiguity on the unanimity issue by arguing there were four component assaults, but the court believed there was no unanimity problem because it was indisputable that the last of the acts, the actual stabbing,

assault occurred at some point during the continuous course of conduct and all other elements were met, defendant was guilty.

[5]     The prosecution asked the trial court to include language stating, "[a]n object is inherently deadly if it is deadly or dangerous in the ordinary use for which it was designed." The trial court declined.

6

was by definition an assault with a deadly weapon. In the trial court's view, the only issue was whether defendant acted in self-defense, but self-defense was not available as a matter of law both because the defendant initiated the fight and because defendant's stabbing response was not a proportional use of force in any event.

The court sentenced defendant to the upper term of four years but suspended execution of the sentence and placed defendant on two years' probation with 364 days in county jail, including credit for time served.

## II. DISCUSSION

Defendant's three arguments for reversal are unavailing. First, the one-minute long assault was a continuous course of conduct for which no unanimity instruction was required; the prosecutor's description of the altercation as being comprised of four components did not change the nature of the charged crime. Second, the trial court did not err, prejudicially or otherwise, by declining to prevent the prosecutor or witnesses from referring to Gabriel, who defendant admitted to stabbing, as the "victim." Third, though the People correctly concede it was error to instruct the jury that the knife in question was an inherently deadly weapon, the People are also right that the error was not prejudicial under the test our Supreme Court articulated in *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*).

### A. *No Unanimity Instruction Was Required*

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore,

7

cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid*.) "[N]o unanimity instruction is required[, however,] if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]. There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679; see also *People v. Jo* (2017) 15 Cal.App.5th 1128, 1178.)

We review claims of instructional error de novo (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707), and we hold no unanimity instruction was required in this case because the charged assault was a continuous course of conduct.

During the assault, defendant walked up to Gabriel, obtained his attention by poking him with a sheathed knife, unsheathed the knife, and jabbed Gabriel with it. A tussle ensued and culminated in defendant stabbing Gabriel. This entire interaction lasted just one minute, give or take. The scenario here therefore fits comfortably in the category of circumstances where courts have determined there is a continuous course of conduct that does not require a unanimity

8

instruction. (*People v. Williams* (2013) 56 Cal.4th 630, 682 [unanimity instruction not required where the criminal acts "'took place within a very small window of time'"]; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 573 [a continuous course of conduct exists "when the same actor performs the same type of conduct at the same place within a short period of time, such that a jury cannot reasonably distinguish different instances of conduct"] (*Hernandez*).)

Additionally, defendant claimed only one defense (self-defense) to the conduct for which he was charged, no matter how oddly the case was argued by the prosecutor. That is further independent reason to conclude no unanimity instruction was required. (See, e.g., *People v. Williams*, *supra*, 56 Cal.4th at 682 [no unanimity instruction required "'when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them'"]; *Hernandez*, *supra*, 217 Cal.App.4th at 573 [exception applies "when a defendant proffers the same defense to multiple acts because the return of a guilty verdict indicates that the jury rejected the defendant's defense in toto."].)

Defendant's arguments to avoid this conclusion are all unpersuasive. He emphasizes the prosecution broke the assault into four component assaults during closing argument, but the prosecution did emphasize that there was only one charged offense and there was no evidence (the prosecutor's argument is not evidence—as the jury was instructed) that multiple discrete assaults occurred. Defendant also argues the unanimity instruction was required because he had different available defenses to certain components of the crime identified by the prosecution and he believes the jury could have rationally

9

concluded there was reasonable doubt regarding whether defendant acted in self-defense as to some of the prosecution-identified acts.  The defenses defendant describes, however, do not amount to the sort of *distinct* defenses that have been found to support a unanimity instruction.  (See, e.g., *People v. Davis* (2005) 36 Cal.4th 510, 562 ["the potential defenses to the two acts of robbery were entirely different: as to the car, the defense was that Boyd was not legally in possession of it; as to the rings, the defense was that its taking constituted only the lesser included crime of theft"]; *Hernandez*, *supra*, 217 Cal.App.4th at 574 [defense to one alleged incident of possession was that defendant did not have a gun; defense to another was that defendant did not have dominion or control over the gun].)

> B.  *The Trial Court Did Not Err by Declining to Order the Prosecutor and Witnesses to Refrain from Referring to Gabriel as the "Victim"*

A century and a half ago, in *People v. Williams* (1860) 17 Cal. 142 (*Williams*), the defendant argued a jury instruction referring to the deceased subject of the case as a "victim" prejudiced the jury against him in his murder trial.  (*Id.* at 146.) Our antebellum Supreme Court ultimately reversed on other grounds, but the *Williams* court cautioned that the use of "[t]he word *victim*, in the connection in which it appears, is an unguarded expression, calculated, though doubtless unintentionally, to create prejudice against the accused." (*Id.* at 147.)  The court stated it was improper for the trial court to have used the word "victim" when instructing the jury because "[i]t seems to assume that the deceased was wrongfully killed, when

10

the very issue was as to the character of the killing." (*Id.* at 147-148.)

In the 1900s, our Supreme Court returned to the issue of the word "victim" in *People v. Wolfe* (1954) 42 Cal.2d 663 (*Wolfe*). There, the defendant and prosecutor referred to the deceased as "the victim" during the defendant's cross-examination. (*Id.* at 666.) The defendant argued the prosecutor's use of the term "victim" assumed the defendant's guilt and created reversible error, but our Supreme Court disagreed. (*Ibid.*) In doing so, it distinguished *Williams* on the grounds that in *Wolfe* it was the prosecutor—not the trial court—who referred to the deceased as the victim. (*Ibid.*) The court also stated the jury was properly told it was the sole judge of the value and effect of evidence and correctly instructed on the reasonable doubt standard. (*Ibid.*)

Relying on *Williams*, defendant contends the trial court abused its discretion by denying his motion in limine to exclude reference to Gabriel as the "victim." *Williams*, however, is inapposite. Here, as in *Wolfe*, the trial court made no unqualified reference to Gabriel as a "victim"; it was the prosecutor and the testifying police officers who used the term.[6] The distinction is important, and *Wolfe* is the controlling precedent here. There was no error.

### C. The "Inherently Deadly" Knife Instruction Was Harmless

To find a defendant guilty of assault with a deadly weapon, a jury must find, among other things, the defendant "did an act

---

[6] As we already detailed, the prosecutor also did not uniformly refer to Gabriel as the "victim" either.

11

with a deadly weapon that by its nature would directly and probably result in the application of force to a person." (Pen. Code, §§ 240, 245, subd. (a)(1); *People v. Williams* (2001) 26 Cal.4th 779; CALCRIM No. 875.) The court here instructed the jury with former CALCRIM No. 875, which defined "deadly weapon" as follows: "A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

"An "'inherently deadly or dangerous'" weapon is a term of art describing objects that are deadly or dangerous in "'the ordinary use for which they are designed,'" that is, weapons that have no practical nondeadly purpose." (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318-319.) Because a knife has ordinary, innocent purposes such as cutting food or other items, it is not an inherently deadly weapon. (*Aledamat*, *supra*, 8 Cal.5th at 6.) It may, however, be a deadly weapon within the meaning of section 245, subdivision (a)(1) when used in a manner capable of causing and likely to cause death or great bodily injury. (*People v. Brown* (2012) 210 Cal.App.4th 1, 7.)

Defendant argues, and the People concede, it was error for the trial court to instruct the jury that a knife could be an inherently deadly weapon. (*Aledamat*, *supra*, 8 Cal.5th at 6-7.) While the theory that the knife was used in a manner capable of causing and likely to cause death or great bodily injury was legally correct, the theory that the knife was inherently deadly was not.

The parties disagree on whether the conceded error requires reversal. The "alternative-theory error [here] is subject to the . . . *Chapman* harmless error test." (*Aledamat*, *supra*, 8

12

Cal.5th at 13.) Accordingly, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Ibid*.)

We conclude, following *Aledamat*, that the error was indeed harmless. That case involved the same error in former CALCRIM No. 875 that we have here, and our Supreme Court held the error was harmless based on a "number of circumstances." (*Aledamat*, *supra*, 8 Cal.5th at 13.) One of those circumstances was the wording of former CALCRIM No. 875 itself, which juxtaposed "inherently deadly" with "used in such a way that it is capable of causing injury and likely to cause death or . . . great bodily injury" such that the instruction "at least indicates what the 'inherently deadly' language was driving at." (*Aledamat*, *supra*, at 13-14.) Our Supreme Court also looked to the prosecution's closing argument in that case and found it was unlikely the jury would view the weapon at issue there (a box cutter) as inherently deadly without considering how it was used, emphasizing that "no one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon." (*Id*. at 14.) The Supreme Court additionally found it significant that the box cutter's status as a deadly weapon was not really a point of contention: while the defense attorney did not concede the box cutter was a deadly weapon, the attorney also did not argue it was not. (*Ibid*.)

These same circumstances are present here. *Aledamat's* point about the juxtaposition of the wording in CALCRIM No. 875 applies equally in this case. In addition, neither the prosecution nor the defense "suggested to the jury that there were two separate ways it could decide whether the [knife] was a

13

deadly weapon." (*Aledamat*, *supra*, 8 Cal.5th at 14.) In closing argument, the prosecution simply asserted the knife was a deadly weapon with no further embellishment as to the reason and the defense did not contest the point during its closing argument. (*Ibid.* ["counsel never argued that, if he did assault the victim with the box cutter, the box cutter was not a deadly weapon"].)

Furthermore, *Aledamat* reasoned it would have been impossible for the jury not to find the box cutter was capable of causing and likely to cause death or bodily injury based on other facts the jury necessarily found, i.e., that "(1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Aledamat*, *supra*, 8 Cal.5th at 15; see also *ibid.* ["'No reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury"].) The jury here made the same findings as the jury in *Aledamat*. It similarly must have found defendant used the knife "in a way that is capable of causing or likely to cause death or great bodily injury." (*Ibid.*)

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.


We concur:



MOOR, J.



KIM, J.