Filed 3/14/23  P. v. Anderson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094040 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE011579) |
| v. | |
| BRUCE ANDERSON, | |
| Defendant and Appellant. | |

A jury found defendant Bruce Anderson guilty of pimping, persuading another person to become a prostitute, and procuring another person for prostitution based, in part, on testimony related to Facebook and text message exchanges he had with a variety of individuals.  On appeal, defendant asserts some evidence, primarily portions of this testimony, was inadmissible because it involved uncharged prior misconduct and referred to the sex workers at issue in the counts as "victims."  Defendant also contends he received ineffective assistance of counsel because his trial counsel did not object to portions of the testimony that opined on the ultimate issue of his guilt.  Finally, defendant

1

challenges CALCRIM No. 1151, which allows a defendant to be convicted of pandering, even if the target of the pandering is already a prostitute. We find no merit in defendant's contentions and will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The prosecution charged defendant with one count of pimping (Pen. Code, § 266h, subd. (a); count one)[1] and four counts of pandering (§ 266i, subd. (a)(2), (6); counts two through five). The prosecution also alleged defendant had a 2009 burglary (§ 459) conviction, which is a serious felony under section 1192.7, subdivision (c). Each of the counts identified a specific victim under various aliases, B.D. (counts one and two), A.D. (count three), J.D. (count four), and R.D. (count five).

As relevant to this appeal, the prosecution, through the testimony of Detective William Fry, who investigated defendant's conduct, introduced a number of Facebook and text messages into evidence.[2] The detective explained he had set up an undercover appointment with B.D. at a motel. Once he had her location, he backed out of the appointment. The next day, he and several officers arrested B.D. at the motel. They also seized her cell phone.

Detective Fry reviewed a large number of Facebook and text messages as part of his investigation, including messages from B.D. and defendant. Defendant's alias in the messages was "Supaman" or "Blu." Among other things, the two texted about sex buyers arriving and departing her location, and their activities at the location. Detective Fry explained defendant likely waited out in a parking lot for buyers to arrive and monitored

---

[1] Undesignated statutory references are to the Penal Code.

[2] The specific messages at issue in this appeal are discussed in greater detail, where relevant, below.

B.D.'s activities. Exploiters[3] often do this to ensure the safety of their victims and to control their victims. Detective Fry said the messages were consistent with B.D. meeting sex buyers. In an interview with B.D., clips of which were played at trial, B.D. confirmed to Detective Fry that defendant monitored her phone use, which the detective explained was a common way for exploiters to control sex worker activities.[4]

In one instance, the two discussed nearby police. Detective Fry explained exploiters typically conduct surveillance to determine whether law enforcement was nearby.

The exchanges also included terms used in the prostitution subculture and discussions of prostitution business practices. Defendant referred to B.D. "choos[ing] up," which Detective Fry explained was used to describe a situation where a victim would leave one exploiter to work for another. Typically, the victim would have to pay a "choosing fee" to the new exploiter. B.D. referred to defendant as "Daddy," which the detective explained is a term used to reference an exploiter or pimp, though he acknowledged the word could be used in a nonprostitution context. B.D. also discussed creating an online ad for a commercial sex Web site.

In messages between R.D. and defendant, the two referred to R.D. as defendant's "bottom bitch," or highest earning sex worker. They also discussed the amount of money she would give him.

In a set of messages between defendant and A.D., A.D. discussed placing an Internet ad for commercial sex work, and defendant referenced his knowledge of prospects for sex work in San Diego. They also discussed sex work in Merced. In another, he made references to "snow," which the detective interpreted as meaning that

---

[3] At trial, the witnesses used the terms "exploiter" and "pimp" interchangeably.

[4] B.D. also testified at trial about her relationship with defendant.

defendant was "exploiting a white female sex worker."  They discussed Web sites and practices for commercial sex workers.  They also discussed various configurations of exploiter/sex worker relationships.  In one exchange, defendant asked A.D. to do sex work for him.  He sent similar messages to other women, as well.  In one set of messages, defendant negotiated with another exploiter about taking one of their sex workers.  In other messages, defendant referred to himself as a pimp.

Sergeant John Sydow, an expert in sexual exploitation, pimping, pandering, and human trafficking, testified for the prosecution.  Among other things, he explained that pimps frequently use social media, like Facebook, to reach potential sex workers.  The prosecutor gave Sergeant Sydow an extended hypothetical, which included messages such as those exchanged between defendant and the victims, and asked whether the individual in the hypothetical was pandering another individual represented in the hypothetical.  The sergeant replied that he was.

The jury found defendant guilty on all counts, and the court found true the prior conviction allegation.

## DISCUSSION

### I

*Uncharged Conduct Evidence*

Defendant argues the trial court abused its discretion when it admitted several items of evidence concerning his prior uncharged misconduct.  In particular, defendant objects to the admission of evidence that he was convicted in 2015 of promoting prostitution in Washington state, and 11 Facebook message exchanges from defendant referencing pimping or prostitution.  We find no merit in defendant's argument.

A.    *Background*

Before trial, the prosecution filed a motion in limine to introduce evidence of 11 exchanges that occurred between 2018 and 2020 to show evidence of defendant's attempts to persuade women to engage in prostitution, along with his 2015 Washington

4

conviction. The motion explained the exchanges, each of which was ultimately introduced at trial during Detective Fry's testimony.

In the first exchange, defendant exchanged messages with another man in an attempt to obtain a sex worker. The two used jargon common in the prostitution subculture.

In the second exchange, defendant messaged a woman referring to himself as a "p," or pimp, and offering to make the woman his "main bitch." The detective explained this exchange was an example of an exploiter grooming and recruiting a potential sex worker.

In the third exchange, defendant messaged a man and discussed Web sites used for commercial sex work and discussed various logistical issues in sex work.

In the fourth exchange, defendant messaged someone and said, "My bitch gt a date coming so I can't be on the video shit," which the detective read to mean defendant had a sex buyer on the way to meet up with one of his sex workers.

In the fifth exchange, defendant messaged someone referring to himself as a "pimp."

In the sixth exchange, defendant had a series of messages with a woman, which Detective Fry interpreted as an attempt to recruit a new sex worker.

In the seventh exchange, defendant exchanged messages with a woman; Detective Fry interpreted the messages as another attempt to recruit a new sex worker.

In the eighth exchange, defendant told a man that he "just lost [his] hoe," and referenced one of his sex workers having a "call."

In the ninth exchange, defendant messaged a woman who had recently left her exploiter. Defendant told her he was "the real p tho," and discussed various Web sites for commercial sex workers.

In the 10th exchange, defendant messaged a woman and exchanged sexually charged messages and pictures, saying, "You go be my bottom."

5

In the 11th exchange, defendant messaged a woman asking if she was "ready to be my bottom," and asked her if she "be postin or blade." Detective Fry explained this meant defendant was looking for a "bottom bitch or a main sex worker, his highest earning sex worker." He testified defendant was trying to recruit the woman as a sex worker.

The motion also sought to admit defendant's 2015 Washington state conviction for promoting prostitution.

The court granted the prosecution's motion, saying the Facebook messages "are relevant to material issues in dispute because they tend to show that [defendant], if he committed any of the acts alleged did so with the mental state required for each charge in this case." The messages were relevant to count one because they tended to show he had knowledge that B.D. was engaging in prostitution, and they were relevant to the other counts because they tended to show he had the specific intent to influence B.D., A.D., J.D., and R.D. to engage in prostitution. The degree of similarity between the uncharged conduct and the charged conduct was substantial, so they fell under Evidence Code section 1101, subdivision (b).

Balancing the evidence under Evidence Code section 352, the court considered the frequency, date proximity, and number of messages at issue, and concluded the probative value was substantial and outweighed any risk of undue prejudice, confusion of the issues, or undue consumption of time.

A similar analysis applied to the prior conviction. Although the conviction was fairly prejudicial, the court concluded the probative value was not substantially outweighed by the prejudicial impact. The court also considered whether, taken together, the evidence would be cumulative or lead to undue prejudice, and concluded it would not. The court noted the prosecution would not be permitted to introduce the particular details of the prior conviction.

During trial, while the messages were being introduced into evidence, defense counsel reiterated her objection to the messages, saying they were becoming cumulative. The court overruled the objection, saying that although many of the exchanges were similar to each other, the similarity was, in part, what made them admissible under Evidence Code section 1101, subdivision (b). The parties agreed the People took slightly over one hour to introduce the evidence.

B.    *Analysis*

A trial court's ruling under Evidence Code section 1101, subdivision (b) is reviewed for an abuse of discretion.  (*People v. Moore* (2016) 6 Cal.App.5th 73, 92.)  As such, "we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

Generally, evidence "of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)  However, uncharged acts are admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [a person's] disposition to commit such an act."  (Evid. Code, § 1101, subd. (b).)

The admissibility of uncharged acts " ' "depends upon three principal factors:  (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged [act] to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." ' " (*People v. Moore, supra*, 6 Cal.App.5th at p. 92.)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  " ' "[T]he trial

7

court [has] broad discretion when weighing the probative value and prejudicial effect of proffered evidence" ' [citation], and that exercise of discretion 'will not be disturbed on appeal unless the prejudicial effect of evidence so admitted clearly outweighed its probative value.' [Citation.]" (*People v. Clark* (2019) 43 Cal.App.5th 270, 291.)

To prove pimping, the prosecution was required to prove defendant "knew that [B.D.] was a prostitute." (See CALCRIM No. 1150.) To prove pandering, the prosecution was required to prove defendant intended to influence B.D., A.D., R.D., and/or J.D. to be a prostitute. (See CALCRIM No. 1151.)

We find persuasive the analysis of a similar situation in *People v. Clark, supra*, 43 Cal.App.5th 270. In *Clark*, the defendant was convicted of trafficking a minor, attempted pimping of a minor, and pandering. (*Id.* at p. 273.) The prosecution introduced several text messages with third parties, including messages in which the defendant referred to himself as " 'P' " and messages with women encouraging them to do sex work for him. (*Id.* at pp. 276-277.) On appeal, the defendant asserted the evidence was improper character evidence under Evidence Code section 1101 and should have been excluded. (*Clark*, at p. 289.) The court disagreed, saying the evidence was relevant to the issue of the defendant's intent because it "gave 'meaning to the conversations that [the defendant had] with [the victim].' " (*Id.* at p. 290.) Similarly, the evidence was highly probative under Evidence Code section 352 because the "defendant used language that is unique to the pimping subculture, [and] the evidence provided the jury with context necessary to understand defendant's communications." (*Clark*, at p. 291.) Although there was a risk of undue prejudice because of the emotional bias it might induce, the evidence was within the trial court's discretion to admit. (*Id.* at pp. 291-292.)

Here, as in *Clark*, defendant referred to himself as a pimp in many of his messages and, according to Detective Fry's testimony, attempted to induce women to become prostitutes. The messages demonstrated defendant's knowledge and use of jargon

common in the prostitution subculture, as well as common practices for prostitutes, tending to prove he would have known B.D. was a prostitute. As such, the court did not abuse its discretion in finding the messages and conviction were admissible under Evidence Code section 1101, subdivision (b).

For similar reasons, the evidence had great probative value under Evidence Code section 352. And, as in *Clark*, although the messages, either alone or in conjunction with the prior conviction, were prejudicial, we cannot say the prejudicial effect clearly outweighed the probative value of providing context for defendant's messages to the victims. In any case, the trial court's legal analysis shows it did not make its evidentiary ruling in an arbitrary, capricious, or patently absurd manner. Thus, defendant has shown no abuse of discretion.

## II

### *Ineffective Assistance of Counsel*

Defendant argues trial counsel was ineffective because she failed to object to testimony by Detective Fry that "was tantamount to Fry [expressing an] opinion that [defendant] was guilty of Count 4, [pandering] which required proof that [defendant] agreed to give money or a thing of value to procure or attempt to procure [J.D.] for the purpose of prostituting her." Defendant also asserts Detective Fry expressed an opinion that defendant was guilty of count three, "which required proof of [defendant's] inducement of [A.D.] to prostitute for him." According to defendant, the failure to object to this testimony was improper and prejudicial. We disagree.

A.    *Additional Background*

Defendant objects to two specific exchanges in Detective Fry's direct examination. In the first, the prosecutor asked the detective to interpret a message from defendant to A.D., reading "so when you go fuck with me, can I be Daddy?" The detective explained, "He's asking to basically have [A.D.] as his victim in order to exploit her as a sex worker. As Daddy is a term that exploiters will often require their

9

victims to call them as it's similar to the power dynamic, where they don't view them as equals, and you are supposed to respect the father or Daddy."

In the second, defendant exchanged a series of messages with another man, with defendant saying, "Aye P if you ain't serving me no news or the bitch finna choose dnt hit me p." The other man eventually responds, "WIt her man bruh . . . Fall back bruh fA real." Asked to interpret this sequence, Detective Fry explained, "So, it's basically an exploiter trying to take another exploiter's victim, such as knocking a new victim." After reading more of the conversation, he expanded on his answer, saying, "I developed the opinion that [defendant] was scrolling on Facebook. He was attempting to contact other females who he was attempting to exploit, or pander, or encourage to work as a sex worker. [¶] He contacted this female based on the messages. I don't believe it was that female communicating. I believe it was another exploiter, and that exploiter was telling him to, hey, back off. Don't knock this girl. You are not going to knock her. [¶] And then later on, they come to an agreement that the exploiter was willing to sell her in order to be exploited by another exploiter."

B.    *Analysis*

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) To show prejudice, a "defendant must also show ' "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 49.) A reviewing court may reject a claim of ineffective assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either prong. (*Strickland*, at p. 697.)

10

Defendant has not shown Detective Fry's testimony in these two exchanges was prejudicial. The basic conclusion in the first statement, that defendant was asking A.D. to work for him as a sex worker, was amply supported by other evidence. Defendant had multiple conversations with A.D. involving commercial sex work, including prospects for working in various locations. He told her he wanted to "build this empire with you," which meant that he wanted her to work for him as a sex worker so that they could make a lot of money. Moreover, the jury received similar testimony from Sergeant Sydow in the form of an expert hypothetical that included the messages between A.D. and defendant.

As to J.D., Sergeant Sydow also explained the mechanics by which exploiters would exchange sex workers with each other for money or goods. The jury then received a set of messages between defendant and another man discussing one such transaction, with the other man saying, "She['s] taken," but later saying he would "bring her to u" next to a mention of a "donation."

The jury received instructions permitting it to "disregard all, or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence" and cautioning that it was not required to accept opinions as true or correct. And, Detective Fry's two statements comprised only a small part of his testimony, among dozens of message exchanges in documentary exhibits. Given the context of those statements, it is not reasonably probable the jury's conclusion would have been different absent Detective Fry's characterization of the conversations. Thus, even if defense counsel should have objected to the statements, defendant has not shown ineffective assistance of counsel.

III

*"Victim" References*

Defendant argues the two portions of Detective Fry's testimony identified above in section II also ran afoul of the trial court's in limine ruling prohibiting the parties from referring to the complaining witnesses as "victims." Defendant argues these two

11

references rendered his trial "fundamentally unfair" and violated his federal constitutional right to due process. We disagree.

A.      *Additional Background*

Defendant initially filed a motion in limine asking that the complaining witnesses be referred to using their first names, rather than as "victims." The trial court granted the motion, but added the caveat that "the Court certainly is mindful that the use of the word 'victim' is exceedingly common in criminal cases, and even more common specifically among law enforcement officers, so, it might even be safe to say -- that it's safe to say there could be a slip during the trial. [¶] And if that occurs, we will address it accordingly. But I guess the reason I'm telling you this is because if somebody does slip in good faith and uses that term, it isn't going to result in a mistrial right off the bat. So, I just want to make sure everybody is on the same page about that."

The prosecutor asked to clarify the court's ruling, noting that she might need to ask questions about prostitution subculture that could refer to victims generically, and defense counsel clarified that she only objected to the use of victim as to the specific "named individuals in the complaint." The court confirmed that generalizations about persons other than the named victims would be acceptable.

Defendant's objection on appeal arises out of the same two Facebook messaging exchanges referenced above. In particular, defendant points to the detective's interpretation of the question, "can I be Daddy?" The detective's response included the term "victim," saying, "He's asking to basically have [A.D.] as his victim in order to exploit her as a sex worker." In the second exchange, which involved defendant's attempt to procure a new sex worker, Detective Fry explained, "So, it's basically an exploiter trying to take another exploiter's victim, such as knocking a new victim."

12

B.    *Analysis*

Defendant relies on *People v. Williams* (1860) 17 Cal. 142 to argue that Detective Fry's two references to victims effectively characterized defendant as a criminal, depriving defendant of his due process rights.

In *Williams*, the defendant argued that a jury instruction referring to the deceased subject of the case as a victim prejudiced the jury against him in his murder trial. (*People v. Williams, supra*, 17 Cal. at p. 147.) While our Supreme Court did not reverse the judgment on these grounds, it cautioned that "[t]he word *victim*, in the connection in which it appears, is an unguarded expression, calculated, though doubtless unintentionally, to create prejudice against the accused. . . . The Court should not, directly or indirectly, assume the guilt of the accused, nor employ equivocal phrases which may leave such an impression." (*Ibid.*) Although the Supreme Court was unwilling to "critici[z]e language very closely in order to reverse a judgment of this sort," it emphasized that in the face of conflicting evidence, "an equivocal expression coming from the Judge, may be fatal to the prisoner." (*Ibid.*) Thus, *Williams* underscored the idea that the trial court, as a neutral body, must be cautious about indirectly influencing a jury through its use of language, and specifically, use of the term victim. (*Ibid.*)

As the Attorney General notes, the California Supreme Court distinguished *Williams* in *People v. Wolfe* (1954) 42 Cal.2d 663. In *Wolfe*, the defendant and prosecutor referred to the deceased as " 'the victim' " during the defendant's cross-examination. (*Id.* at p. 666.) The Supreme Court disagreed that the prosecutor's use of the term victim assumed the defendant's guilt and created reversible error, however. (*Ibid.*) Specifically, the Supreme Court noted it was the prosecutor, rather than the trial court, who referred to the deceased as the victim. (*Ibid.*) It further noted the jury was properly instructed that it was the sole judge of the value and effect of evidence and was also instructed on the reasonable doubt standard, insulating from any prejudicial effect the victim reference might create. (*Ibid.*)

13

Here, as in *Wolfe*, the references defendant complains of did not come from the trial court, or even from the prosecutor, but from a prosecution witness who was characterizing a series of confusing messages between defendant and others. Thus, consistent with *Wolfe*, the use of the term here would not have improperly influenced the jury as suggested in *Williams*. And, as in *Wolfe*, the trial court instructed the jury that it was the sole judge of any fact in issue, it could accept or reject any testimony by any witness, it was entitled to disregard any opinion or characterization it determined was not supported by the evidence, and the prosecution was required to prove guilt beyond a reasonable doubt. We presume the jurors understood and followed all instructions. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.) Accordingly, to the extent Detective Fry's statements implied the named complainants were victims, we see no reversible error.[5]

IV

*Jury Instructions*

Defendant argues the trial court erred when it instructed the jury using a constitutionally flawed CALCRIM No. 1151, which explains that, for the purposes of the pandering charges, it does not matter whether the victims were already prostitutes. Defendant acknowledges the California Supreme Court's contrary holding in *People v. Zambia* (2011) 51 Cal.4th 965, 981, that a defendant can be convicted of pandering under section 266i by encouraging someone who is already a prostitute to engage in prostitution, but argues the decision should be reversed.

---

[5] Because we find no error and/or prejudice in any of defendant's evidentiary contentions, and because the bulk of the asserted error arises out of only two comparatively minor statements by one witness, we likewise reject defendant's conclusory argument that the cumulative nature of the errors in his case deprived him of his right to due process.

We are bound by the Supreme Court's decision in *People v. Zambia, supra*, 51 Cal.4th 965 (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and we must reject defendant's challenge accordingly.

### DISPOSITION

The judgment is affirmed.

/s/
EARL, J.

We concur:

/s/
HULL, Acting P. J.

/s/
BOULWARE EURIE, J.

15